# MESA ET AL. *v.* CALIFORNIA

No. 87–1206.   Argued December 6, 1988—Decided February 21, 1989

O'CONNOR, J., delivered the opinion for a unanimous Court. BRENNAN, J., filed a concurring opinion, in which MARSHALL, J., joined, *post,* p. 140.

*Deputy Solicitor General Ayer* argued the cause for petitioners. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Bolton, Michael K. Kellogg, Barbara L. Herwig,* and *John S. Koppel.*

*Kenneth Rosenblatt* argued the cause and filed a brief for respondent.

JUSTICE O'CONNOR delivered the opinion of the Court.

We decide today whether United States Postal Service employees may, pursuant to 28 U. S. C. § 1442(a)(1), remove to Federal District Court state criminal prosecutions brought against them for traffic violations committed while on duty.

## I

In the summer of 1985 petitioners Kathryn Mesa and Shabbir Ebrahim were employed as mailtruck drivers by the United States Postal Service in Santa Clara County, California. In unrelated incidents, the State of California issued criminal complaints against petitioners, charging Mesa with misdemeanor-manslaughter and driving outside a laned roadway after her mailtruck collided with and killed a bicyclist, and charging Ebrahim with speeding and failure to yield after his mailtruck collided with a police car. Mesa and Ebrahim were arraigned in the San Jose Municipal Court of Santa Clara County on September 16 and October 2, 1985, respectively. The Municipal Court set a pretrial conference in Mesa's case for November 4, 1985, and set trial for Ebrahim on November 7, 1985.

On September 24 and October 4, 1985, the United States Attorney for the Northern District of California filed petitions in the United States District Court for the Northern District of California for removal to that court of the criminal complaints brought against Ebrahim and Mesa. The petitions alleged that the complaints should properly be removed to the Federal District Court pursuant to 28 U. S. C. § 1442(a)(1) because Mesa and Ebrahim were federal employees at the time of the incidents and because "the state charges arose from an accident involving defendant which occurred while defendant was on duty and acting in the course and scope of her employment with the Postal Service." Mesa Petition for Removal of Criminal Action ¶3, App. 5. See also Ebrahim Petition for Removal of Criminal Action ¶3, App. 10 ("[T]he state charges arose from an accident in-

volving defendant which occurred while defendant was on duty"). The Santa Clara County District Attorney filed responsive motions to remand, contending that the State's actions against Mesa and Ebrahim were not removable under § 1442(a)(1). The District Court granted the United States Government's petitions for removal and denied California's motions for remand.

California thereupon petitioned the Court of Appeals for the Ninth Circuit to issue a writ of mandamus compelling the District Court to remand the cases to the state court. The Court of Appeals consolidated the petitions, and a divided panel held that "federal postal workers may not remove state criminal prosecutions to federal court when they raise no colorable claim of federal immunity or other federal defense." 813 F. 2d 960, 967 (1987). Accordingly, the Court of Appeals issued a writ of mandamus ordering the District Court to deny the United States' petitions for removal and remand the prosecutions for trial in the California state courts. We granted the United States' petition for certiorari on behalf of Mesa and Ebrahim, 486 U. S. 1021 (1988), to resolve a conflict among the Courts of Appeals concerning the proper interpretation of § 1442(a)(1). We now affirm.

## II

The removal provision at issue in this case, 28 U. S. C. § 1442(a), provides:

> "A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> "(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the appre-

hension or punishment of criminals or the collection of the revenue.

"(2) A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

"(3) Any officer of the courts of the United States, for any act under color of office or in the performance of his duties;

"(4) Any officer of either House of Congress, for any act in the discharge of his official duty under an order of such House."

The United States and California agree that Mesa and Ebrahim, in their capacity as employees of the United States Postal Service, were "person[s] acting under" an "officer of the United States or any agency thereof" within the meaning of § 1442(a)(1). Their disagreement concerns whether the California criminal prosecutions brought against Mesa and Ebrahim were "for act[s] under color of such office" within the meaning of that subsection. The United States, largely adopting the view taken by the Court of Appeals for the Third Circuit in *Pennsylvania* v. *Newcomer*, 618 F. 2d 246 (1980), would read "under color of office" to permit removal "whenever a federal official is prosecuted for the manner in which he has performed his federal duties . . . ." Brief for Petitioners 8. California, following the Court of Appeals below, would have us read the same phrase to impose a requirement that some federal defense be alleged by the federal officer seeking removal.

## A

On numerous occasions in the last 121 years we have had the opportunity to examine § 1442(a) or one of its long line of statutory forebears. In *Willingham* v. *Morgan*, 395 U. S. 402, 405 (1969), we traced the "long history" of the federal officer removal statute from its origin in the Act of February 4, 1815, § 8, 3 Stat. 198, as a congressional response to New

England's opposition to the War of 1812, through its expansion in response to South Carolina's 1833 threats of nullification, and its further expansion in the Civil War era as the need to enforce revenue laws became acute, to enactment of the Judicial Code of 1948 when the removal statute took its present form encompassing all federal officers. 395 U. S., at 405–406. "The purpose of all these enactments," we concluded, "is not hard to discern. As this Court said . . . in *Tennessee* v. *Davis*, 100 U. S. 257, 263 (1880), the Federal Government

> "'can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection, — if their protection must be left to the action of the State court, — the operations of the general government may at any time be arrested at the will of one of its members.'" *Id.*, at 406.

*Tennessee* v. *Davis*, 100 U. S. 257 (1880), involved a state murder prosecution brought against a revenue collector who claimed that, while he was in the act of seizing an illegal distillery under the authority of the federal revenue laws, "he was assaulted and fired upon by a number of armed men, and that in defence of his life he returned the fire," killing one of the assailants. *Id.*, at 261. Davis sought to remove the prosecution to federal court and Tennessee challenged the constitutionality of the removal statute. Rev. Stat. § 643. Justice Strong framed the question presented thus:

> "Has the Constitution conferred upon Congress the power to authorize the removal, from a State court to a Federal court, of an indictment against a revenue officer for an alleged crime against the State, and to order its

removal before trial, *when it appears that a Federal question or a claim to a Federal right is raised in the case, and must be decided therein?"* 100 U. S., at 262 (emphasis added).

Justice Strong's emphasis on the presence of a federal defense unifies the entire opinion. He thought it impossible that the Constitution should so weaken the Federal Government as to prevent it from protecting itself against unfriendly state legislation which "may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws [or] may deny the authority conferred by those laws." *Id.*, at 263.

Despite these references to a federal defense requirement, the United States argues that Davis justified the killing solely on grounds of self-defense and that the question whether Davis' act of self-defense was actually justified is purely a question of state law, there being no "federal common law of 'justification' applicable to crimes committed by federal employees in the performance of their duties . . . ." Brief for Petitioners 20, n. 7. Thus, the Government concludes, despite much contrary language in the opinion, the fact that we approved the removal of Davis' prosecution demonstrates that no federal defense is necessary to effect removal.

What the Government fails to note is that the successful legal defense of "self-defense" depends on the truth of two distinct elements: that the act committed was, in a legal sense, an act of self-defense, and that the act was justified, that is, warranted under the circumstances. In Davis' case, the truth of the first element depended on a question of federal law: was it Davis' duty under federal law to seize the distillery? If Davis had merely been a thief attempting to steal his assailants' property, returning their fire would simply not have been an act of self-defense, pretermitting any question of justification. Proof that Davis was not a thief depended on the federal revenue laws and provided the necessary pred-

icate for removal.   See *In re Neagle,* 135 U. S. 1, 94 (1890) (Lamar, J., dissenting) ("In *Tennessee* v. *Davis* . . . [t]he homicide, for which the petitioner was prosecuted, was committed by him while executing his duties, as a revenue officer, in pursuance of the express requirements of the revenue laws, and in defence of his own life, upon a party offering *unlawful* resistance") (emphasis added); *Maryland* v. *Soper (No. 2),* 270 U. S. 36, 42 (1926) ("Thus removals of prosecutions on account of acts done in enforcement of the revenue or prohibition laws or under color of them properly include those acts committed by a federal officer in defense of his life, threatened while enforcing or attempting to enforce the law.   Such acts of defense are really part of the exercise of his official authority.   They are necessary to make the enforcement effective").   Accordingly, as Justice Strong's conclusion in *Davis* makes clear, we upheld the constitutionality of the federal officer removal statute precisely because the statute predicated removal on the presence of a federal defense:

> "It ought, therefore, to be considered as settled that the constitutional powers of Congress to authorize the removal of criminal cases for alleged offences against State laws from State courts to the circuit courts of the United States, *when there arises a Federal question in them,* is as ample as its power to authorize the removal of a civil case."   100 U. S., at 271 (emphasis added).

Prior to *Davis,* we had considered the scope of congressional power to authorize the removal of a civil case in *The Mayor* v. *Cooper,* 6 Wall. 247 (1868), and again focused on the presence of a federal defense.   Cooper sued the mayor and aldermen of Nashville, Tennessee, for trespasses on real estate and the asportation and conversion of chattels occurring during or shortly after the Civil War.   The city officials sought to remove the suit to federal court under the federal officer removal statute.   Act of Mar. 3, 1863, ch. 81, § 5, 12 Stat. 756.   They contended that at the time of the alleged trespasses, the mayor and aldermen of Nashville were ap-

pointees of the Military Governor of Tennessee and that the trespasses were committed under the order of a Union general. Cooper contended that the removal statute was unconstitutional. In upholding the statute's constitutionality, we observed: "Nor is it any objection that questions are involved which are not all of a Federal character. If one of the latter exist, if there be a single such ingredient in the mass, it is sufficient. *That element is decisive upon the subject of jurisdiction.*" 6 Wall., at 252 (emphasis added). For purposes of removal, we only required the mayor and aldermen to allege a colorable defense under federal law; "[t]he validity of the defence authorized to be made is a distinct subject. It involves wholly different inquiries. . . . It has no connection whatever with the question of jurisdiction." *Id.*, at 254.

Although we have not always spoken with the same clarity that these early decisions evince, we have not departed from the requirement that federal officer removal must be predicated on the allegation of a colorable federal defense. The United States argues that *Cleveland, C., C. & I. R. Co.* v. *McClung*, 119 U. S. 454 (1886), stands for the proposition that a federal defense is not a prerequisite to removal. In *McClung* a railroad brought suit in state court for recovery of a lien, alleging that a collector of customs had a federal duty under § 10 of 21 Stat. 175 to notify the carrier claiming the lien before delivering merchandise to its ultimate consignees even if the consignees had paid over the lien to the collector. The collector sought to remove the suit to federal court, setting up as his defense that he had no duty to notify the carrier under the federal statute. Despite the obvious presence of a federal question—the proper interpretation of § 10 of the statute—the United States argues that, because the collector's defense was the *absence* of a federally created duty under the statute, his was not a federal defense. The argument is unavailing. Apart from the fact that the carrier itself could have brought suit in federal court based on "arising under" jurisdiction, the collector's defense was clearly

based on the statute's determination of the scope of his duties. To assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits. Both are equally defensive and equally based in federal law.

A later railroad case, *Gay* v. *Ruff*, 292 U. S. 25 (1934), points more definitively to our continuing understanding that federal officer removal must be predicated on a federal defense. *Gay* was a civil action but with facts remarkably similar to those in the criminal complaint brought against Mesa. Ruff filed suit in state court against Gay, the receiver of a railroad appointed by a Federal District Court, for the wrongful death of his son as a result of the negligent operation of a train by employees of the receiver. Gay sought to remove the action to federal court pursuant to § 33 of the Judicial Code, Act of Aug. 23, 1916, ch. 399, 39 Stat. 532, the then-current version of the federal officer removal statute. Much of Justice Brandeis' opinion is devoted to determining whether railroad receivers were "officer[s] of the courts of the United States" for purposes of a recent amendment to the removal statute which provided that such an officer could remove to federal court civil or criminal actions against him brought "for or on account of any act done under color of his office or in the performance of his duties as such officer." Cf. 28 U. S. C. § 1442(a)(3). In the course of his examination of the history of Judicial Code § 33, Justice Brandeis concluded that "it applied . . . only when the person defending caused it to appear that his defense was that in doing the acts charged he was doing no more than his duty under those [revenue] laws or orders [of either House of Congress]." 292 U. S., at 33. Applying this understanding to the recent amendment concerning court officers, Justice Brandeis observed that "[t]he defendant receiver does not justify under any judgment or order of a federal court. Nor does the suit

present otherwise any federal question. Its only relation to the federal law is that the receiver sued was appointed by a federal court . . . ." *Id.*, at 34. This, "in harmony with the trend of legislation providing that the federal character of the litigant should not alone confer jurisdiction upon a federal court," *id.*, at 35, was not enough to sustain the receiver's petition for removal. "The receiver here sued, although an officer of the court operating the railroad pursuant to the order appointing him, is not an officer engaged in enforcing an order of a court. . . . Nor is there reason to assume that he will in this case rest his defense on his duty to cause the train to be operated." *Id.*, at 39.

Finally, the Government relies on *Maryland* v. *Soper (No. 1)*, 270 U. S. 9 (1926), a decision in which we rejected the removal petitions of federal officers. This prohibition era decision involved prohibition agents charged with murder' and rejected the federal officers' removal petitions on the grounds that the averments in the petitions themselves were "not sufficiently informing and specific to make a case for removal . . . ." *Id.*, at 34. In *Soper (No. 1)*, unlike any prior removal case we had adjudicated, the prohibition agents were only able to assert that they neither committed nor had any knowledge of the murder for which they were charged. They had simply come upon a wounded and dying man in the vicinity of an illegal still which they had destroyed after unsuccessfully giving chase to bootleggers. While rejecting the agents' petition as "not sufficiently informing," *ibid.*, Chief Justice Taft also rejected Maryland's contention that a federal officer can successfully remove a criminal prosecution only "by admitting that he did the act for which he is prosecuted." *Id.*, at 32. Rather, the Chief Justice enunciated the following test:

> "There must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him, for whatever offense, has arisen out of the acts

done by him under color of federal authority and in en-
forcement of federal law, and he must by direct aver-
ment exclude the possibility that it was based on acts or
conduct of his not justified by his federal duty. But the
statute does not require that the prosecution must be for
the very acts which the officer admits to have been done
by him under federal authority. It is enough that his
acts or his presence at the place in performance of his of-
ficial duty constitute the basis, though mistaken or false,
of the state prosecution." *Id.*, at 33.

Unlike the Government, we do not understand the causal
connection test of *Soper (No. 1)* to have eliminated the gen-
eral requirement that federal officer removal be predicated
on the existence of a federal defense. *Soper (No. 1)* pre-
sented a unique criminal prosecution, markedly unlike those
before us today, where a federal officer pleaded by traverse
and sought removal. While we rejected the removal petition
at issue in that case, the decision assumed that a situation
could arise in which a petition that pleaded by traverse might
warrant removal. Under such circumstances, we suggested
that careful pleading, demonstrating the close connection be-
tween the state prosecution and the federal officer's perform-
ance of his duty, might adequately replace the specific aver-
ment of a federal defense. We are not today presented with
such a pleading by traverse and need not decide whether re-
moval on the grounds suggested in *Soper (No. 1)* would be
permissible under either the statute or the Constitution.

Similarly, we do not understand *Willingham* v. *Morgan*,
395 U. S. 402 (1969), to have been such a case. In *Willing-
ham*, the petitioner sued federal prison officials in state court
on state tort law grounds for injuries he allegedly had re-
ceived while imprisoned. The officials sought removal on
official immunity grounds. See *Barr* v. *Matteo*, 360 U. S.
564 (1959); *Howard* v. *Lyons*, 360 U. S. 593, 597 (1959) (the
validity of a claim of official immunity to state tort actions
"must be judged by federal standards, to be formulated by

the courts in the absence of legislative action by Congress"); see also *Westfall* v. *Erwin*, 484 U. S. 292, 295 (1988). The central question at issue in *Willingham* was whether the defense of official immunity was sufficient to support removal under § 1442(a)(1). We held that the removal statute "is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law. . . . In fact, one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." 395 U. S., at 406–407.

In *Willingham* we adverted to the causal connection test of *Soper (No. 1)*, not as a substitute for the averment of an official immunity defense, but as a means of delimiting the pleading requirements for establishing a colorable defense of that nature. *Id.*, at 409 ("In this case, once petitioners had shown that their only contact with respondent occurred inside the penitentiary, while they were performing their duties, we believe that they had demonstrated the required 'causal connection.' The connection consists, simply enough, of the undisputed fact that petitioners were on duty, at their place of federal employment, at all the relevant times"). Despite the Government's suggestion, we decline to divorce the federal official immunity defense from the pleadings required to allege it and transform those pleading requirements into an independent basis for jurisdiction. Mesa and Ebrahim have not and could not present an official immunity defense to the state criminal prosecutions brought against them. *Imbler* v. *Pachtman*, 424 U. S. 409, 429 (1976) ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law"). Accordingly, the liberal pleadings sufficient to allege an official immunity defense which we permitted in *Willingham* are inapplicable to removal of the prosecutions before us today.

In sum, an unbroken line of this Court's decisions extending back nearly a century and a quarter have understood all

the various incarnations of the federal officer removal statute to require the averment of a federal defense.

B

In the face of all these decisions, the Government defends the proposition that § 1442(a)(1) permits removal without the assertion of a federal defense. It does so based on the plain language of the removal statute and on the substantial federal interests that would be protected by permitting universal removal of all civil actions and criminal prosecutions brought against any federal official "for the manner in which he has performed his federal duties . . . ." Brief for Petitioners 8.

The critical phrase "under color of office" first appeared in the Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171, and has remained in every version of the removal statute that we have interpreted since we decided *Tennessee* v. *Davis* in 1880. Nevertheless, the Government contends that "under color of office" cannot bear the weight of a federal defense requirement. We agree with the Government that the specialized grants of jurisdiction in the last clause of subsection (1) concerning the apprehension of criminals and the collection of revenue and subsections (2)–(4) of § 1442(a) are largely the "residue" of the pre-1948, more limited removal statutes now entirely encompassed by the general removal provision of the first clause of subsection (1). See P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1057 (3d ed. 1988). The Government, however, derives from consideration of subsection (3)—"[a]ny officer of the courts of the United States, for any act under color of office or in the performance of his duties"—support for its argument that the removal statute "is not limited to cases in which the federal employee raises a federal defense." Brief for Petitioners 26. The Government argues that "in the performance of his duties" must mean something besides "under color of office" in subsection

(3). Nonetheless, by hypothesis, the disjunction in subsection (3) means no more than "under color of such office" in subsection (1). Therefore, the Government concludes, the controlling provision in subsection (1) must be construed broadly to permit removal of any civil actions or criminal prosecutions brought against a federal officer for acts done during the performance of his duties regardless of whether that officer raises a federal defense.

The court officers provision of subsection (3) was added to Judicial Code § 33—the removal statute superseded by the 1948 enactment—by the Act of August 23, 1916, ch. 399, 39 Stat. 532. We considered this provision in *Gay* v. *Ruff*, and explicitly rejected the argument the United States makes today. First, we recognized that the purpose of the 1916 amendment was "'to extend the provisions of section 33 uniformly to officers of the courts of the United States, not only in cases arising under the revenue laws, but in all cases, giving to them the same protection in all cases now given to officers acting under the revenue laws, and to officers of Congress.'" 292 U. S., at 38, quoting H. R. Rep. 776, 64th Cong., 1st Sess., 2 (1916). Second, we also recognized that "[t]here is no expression in the Act of 1916, or in the proceedings which led to its enactment, of an intention to repeal any existing law or to depart from the long-existing policy of restricting the federal jurisdiction." 292 U. S., at 37. Third, as discussed earlier, we noted that the "existing law" which "restrict[ed] the federal jurisdiction" was precisely the requirement that the federal officer predicate removal on the averment of a federal defense. *Id.*, at 33–35, 39; see also *supra*, at 130–131. Accordingly, we concluded that "in the performance of his duties" meant no more than "under color of office," and that Congress meant by both expressions to preserve the pre-existing requirement of a federal defense for removal. Again, we see no reason to depart from this longstanding interpretation of Congress' intent in enacting the removal statute.

136

## C

The Government's view, which would eliminate the federal defense requirement, raises serious doubt whether, in enacting § 1442(a), Congress would not have "expand[ed] the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 491 (1983). In *Verlinden,* we discussed the distinction between "jurisdictional statutes" and "the federal law under which [an] action arises, for Art. III purposes," and recognized that pure jurisdictional statutes which seek "to do nothing more than grant jurisdiction over a particular class of cases" cannot support Art. III "arising under" jurisdiction.* *Id.,* at 496, citing *The Propeller Genesee Chief* v. *Fitzhugh,* 12 How. 443, 451–543 (1852); *Mossman* v. *Higginson,* 4 Dall. 12 (1800). In *Verlinden* we held that the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. § 1330, is a "comprehensive scheme" comprising both pure jurisdictional provisions and federal law capable of supporting Art. III "arising under" jurisidiction. 461 U. S., at 496.

Section 1442(a), in our view, is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant. Section 1442(a), therefore, cannot independently support Art. III "arising under" jurisdiction. Rather, it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if a federal defense were alleged. See *Verlinden, supra,* at 494; *Merrell Dow Pharmaceuticals Inc.* v. *Thompson,* 478 U. S. 804, 808

---

*The "Arising Under" Clause provides: "The judicial Power [of the United States] shall extend to all Cases . . . arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U. S. Const., Art. III, § 2, cl. 1.

(1986) (under the "well-pleaded complaint" rule "[a] defense that raises a federal question is inadequate to confer federal jurisdiction"); *Louisville & Nashville R. Co.* v. *Mottley*, 211 U. S. 149 (1908). Adopting the Government's view would eliminate the substantive Art. III foundation of § 1442(a)(1) and unnecessarily present grave constitutional problems. We are not inclined to abandon a longstanding reading of the officer removal statute that clearly preserves its constitutionality and adopt one which raises serious constitutional doubt. See *Califano* v. *Yamasaki*, 442 U. S. 682, 693 (1979) ("[I]f 'a construction of the statute is fairly possible by which [a serious doubt of constitutionality] may be avoided,' *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932), a court should adopt that construction") (brackets in original).

At oral argument the Government urged upon us a theory of "protective jurisdiction" to avoid these Art. III difficulties. Tr. of Oral Arg. 6. In *Willingham*, we recognized that Congress' enactment of federal officer removal statutes since 1815 served "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties . . . [and] to protect federal officers from interference by hostile state courts." 395 U. S., at 405. The Government insists that the full protection of federal officers from interference by hostile state courts cannot be achieved if the averment of a federal defense must be a predicate to removal. More important, the Government suggests that this generalized congressional interest in protecting federal officers from state court interference suffices to support Art. III "arising under" jurisdiction.

We have, in the past, not found the need to adopt a theory of "protective jurisdiction" to support Art. III "arising under" jurisdiction, *Verlinden, supra*, at 491, n. 17, and we do not see any need for doing so here because we do not recognize any federal interests that are not protected by limiting removal to situations in which a federal defense is alleged. In these prosecutions, no state court hostility or interference

has even been alleged by petitioners and we can discern no federal interest in potentially forcing local district attorneys to choose between prosecuting traffic violations hundreds of miles from the municipality in which the violations occurred or abandoning those prosecutions.

The Santa Clara County Municipal Court, as it happens, is located in San Jose, as is a Federal District Court of the Northern District of California. As California observes, however, other of its county seats may be located up to 350 miles from the nearest Federal District Court. Brief for Respondent 47, n. 25. In other of our Nation's large but less populous States the distances and accompanying burdens on state prosecutors may be even more acute. For example, the distance from Barrow, Alaska, the seat of that State's Second Judicial District, to Nome, where the nearest Federal District Court sits, is over 500 miles. We have emphasized:

> "[U]nder our federal system, it goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government. Because the regulation of crime is pre-eminently a matter for the States, we have identified a strong judicial policy against federal interference with state criminal proceedings." *Arizona* v. *Manypenny*, 451 U. S. 232, 243 (1981) (citations and internal quotations omitted).

It is hardly consistent with this "strong judicial policy" to permit removal of state criminal prosecutions of federal officers and thereby impose potentially extraordinary burdens on the States when absolutely no federal question is even at issue in such prosecutions. We are simply unwilling to credit the Government's ominous intimations of hostile state prosecutors and collaborationist state courts interfering with federal officers by charging them with traffic violations and other crimes for which they would have no federal defense in immunity or otherwise. That is certainly not the case in the prosecutions of Mesa and Ebrahim, nor was it the case in the removal of the state prosecutions of federal revenue agents

that confronted us in our early decisions. In those cases where true state hostility may have existed, it was specifically directed against federal officers' efforts to carry out their federally mandated duties. *E. g., Tennessee* v. *Davis,* 100 U. S. 257 (1880). As we said in *Maryland* v. *Soper (No. 2),* 270 U. S., at 43–44, with respect to Judicial Code § 33:

> "In answer to the suggestion that our construction of § 33 and our failure to sustain the right of removal in the case before us will permit evilly minded persons to evade the useful operations of § 33, we can only say that, if prosecutions of this kind come to be used to obstruct seriously the enforcement of federal laws, it will be for Congress in its discretion to amend § 33 so that the words . . . shall be enlarged to mean that any prosecution of a federal officer for any state offense which can be shown by evidence to have had its motive in a wish to hinder him in the enforcement of federal law, may be removed for trial to the proper federal court. We are not now considering or intimating whether such an enlargement would be valid; but what we wish to be understood as deciding is that the present language of § 33 can not be broadened by fair construction to give it such a meaning. These were not prosecutions, therefore, commenced on account of acts done by these defendants solely in pursuance of their federal authority. With the statute as it is, they can not have the protection of a trial in the federal court . . . ."

Chief Justice Taft's words of 63 years ago apply equally well today; the present language of § 1442(a) cannot be broadened by fair construction to give it the meaning which the Government seeks. Federal officer removal under 28 U. S. C. § 1442(a) must be predicated upon averment of a federal defense. Accordingly, the judgment of the Court of Appeals is affirmed.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

While I concur in the judgment and opinion of the Court, I write separately to emphasize a point that might otherwise be overlooked. In most routine traffic-accident cases like those presented here, no significant federal interest is served by removal; it is, accordingly, difficult to believe that Congress would have intended the statute to reach so far. It is not at all inconceivable, however, that Congress' concern about local hostility to federal authority could come into play in some circumstances where the federal officer is unable to present any "federal defense." The days of widespread resistance by state and local governmental authorities to Acts of Congress and to decisions of this Court in the areas of school desegregation and voting rights are not so distant that we should be oblivious to the possibility of harassment of federal agents by local law enforcement authorities. Such harassment could well take the form of unjustified prosecution for traffic or other offenses, to which the federal officer would have no immunity or other federal defense. The removal statute, it would seem to me, might well have been intended to apply in such unfortunate and exceptional circumstances.

The Court today rightly refrains from deciding whether removal in such a situation is possible, since that is not the case before us. But the Court leaves open the possibility that where a federal officer is prosecuted because of local hostility to his function, "careful pleading, demonstrating the close connection between the state prosecution and the federal officer's performance of his duty, might adequately replace the specific averment of a federal defense." *Ante*, at 132. With the understanding that today's decision does not foreclose the possibility of removal in such circumstances even in the absence of a federal defense, I join the Court's opinion.