STATE OF NORTH CAROLINA,
Plaintiff–Appellant,

v.

Ernest CISNEROS, Defendant–Appellee.

No. 90–5603.

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 1991.

Decided Oct. 21, 1991.

---

William Dale Talbert, Asst. Atty. Gen., Raleigh, N.C., argued (Lacy H. Thornburg, Atty. Gen. of N.C., on brief), for plaintiff-appellant.

Rudolf A. Renfer, Jr., Asst. U.S. Atty., Raleigh, N.C., argued (Margaret Person Currin, U.S. Atty., Richard B. Conely, Sr., Asst. U.S. Atty., on brief), for defendant-appellee.

Before PHILLIPS and WILKINS, Circuit Judges, and KAUFMAN, Senior District Judge for the District of Maryland, sitting by designation.

OPINION

PHILLIPS, Circuit Judge:

The State of North Carolina has appealed from a judgment of the United States District Court for the Eastern District of North Carolina granting Marine Lance Corporal Ernest Cisneros' petition to remove a state prosecution for vehicular homicide and related offenses to federal court, denying North Carolina's motion to remand to state court, and further granting Cisneros' motion to dismiss the state prosecution. Because the intervening decision by this court in *State of North Carolina v. Ivory*, 906 F.2d 999 (4th Cir.1990), holding on indistinguishable facts that federal removal jurisdiction was not established, controls decision in this case, we vacate and remand with directions to remand the state prosecution to the appropriate state court.

I

On April 25, 1989, Lance Corporal Cisneros was on active duty at Camp Lejune, North Carolina, and was assigned as a Truck Company five-ton driver. On that date, he was ordered to drive the lead truck in a convoy of vehicles moving troops from Camp Lejune to a trailing site near Verona Loop, just south of Jacksonville, North Carolina. At some time between 7:45 and 8:00 a.m., Cisneros was driving the vehicle southbound in the center lane of the three-lane U.S. Route 17, just north of the intersection with Old Bridge Street. As he approached the intersection, the light was red. Four other southbound vehicles were stopped at the light, one each in the left and middle lanes, and two in the right lane. The front car in the right lane was a Corvette driven by Kathy Tidwell. For whatever reason, Cisneros failed to stop his truck before it reached the light. At the very last moment, Cisneros veered right, out of the middle lane and across into the right lane, rolling over Tidwell's Corvette. Tidwell was killed in the collision.

Cisneros told investigating police officers that he was driving at a speed within the speed limit at all times and that, as he approached the light, he experienced a mechanical difficulty with the truck that made it impossible to brake. The police who investigated the accident estimated that the truck had been running between 30 and 35 miles per hour (in a 45 mile per hour zone) and had maintained that speed up until the actual collision. The investigators noted eleven-foot skid marks on the road just before it reached the intersection. There was no other physical evidence that Cisneros had attempted to brake.

A police investigator conducted an inspection of the truck at the scene, looking for leaks and damage. He found "no fluid leaks, no broken cables or nothing that would indicate a failure on the vehicle's part." A Vehicle and Equipment Operational Record, dated April 25, signed by Cisneros at 5:00 that morning, indicated that the brakes had been checked and appeared functional. Similarly, the April 24 Vehicle Inspection Form indicated no problems with the brakes. A few hours after the accident, the truck was driven by military authorities away from the accident scene and back to Camp Lejune.

Once the truck was returned to Camp Lejune, civilian investigators performed further investigation of the vehicle. They found that the brake fluid was three quarters of an inch below the top of the reservoir. With the engine running, they performed a series of tests of the brake pedal, finding that even after repeatedly depressing the pedal, the brakes remained functional. They did not drive the vehicle, how-

ever, or test the actual working of the brakes.

On May 1, a team of Marine motor transport personnel conducted their own test on the brake system. They determined that the hydraulic master cylinder and the air pack chamber both suffered from leaks. They concluded that "the braking system would lose braking power when in operation." Further, they determined that downshifting to reduce speed could not be accomplished due to gear defects. Captain T.A. Rademann, who completed an affidavit regarding this test, stated that between January 1988 and February 1989, the vehicle had had five different brake problems requiring replacement of the hydraulic master cylinder on two occasions. In addition, he noted that on dismantling the master cylinder, the Marine investigators found a beetle and a heavy black powder-like substance mixed with the brake fluid. Rademann concluded that the "hydraulic fluid leaks, the worn master hydraulic cylinder, and the unsolved brake problems all contributed to the accident under investigation."

On the day of the accident, the state issued criminal process against Cisneros charging him with failing to reduce speed in order to avoid an accident, in violation of N.C.Gen.Stat. § 20–141, entering an intersection while a stoplight was emitting a steady red light, in violation of N.C.Gen. Stat. § 20–158, and unintentional death by vehicle, in contravention of N.C.Gen.Stat. § 20–141.4. Each charge is a misdemeanor under North Carolina law. The U.S. Attorney petitioned in Cisneros' behalf for removal under 28 U.S.C. § 1442(a)(1) to federal court, averring in the petition that, at the time of the accident, Cisneros was acting "under color of [his federal] office" and "within the scope of his federal employment," and also suggesting that Cisneros "may" have experienced hostile treatment by the state justice system. The state then filed a motion to remand the charges for trial in state court, while Cisneros moved for dismissal of the charges pursuant to the Supremacy Clause, Article VI of the Constitution, because within the principle of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34

L.Ed. 55 (1890), and its progeny, "he was an agent of the United States Government engaged in the performance of his lawful duties and was acting in a manner which he determined was necessary and proper in the discharge of his duties."

The district court conducted an evidentiary hearing on these various motions and petitions. Based on oral testimony and affidavits, the court granted the petition to remove, denied the motion to remand, and dismissed the state prosecution on the grounds that Cisneros was immune from state prosecution. The state now appeals.

## II

After the district court entered its judgment upholding its removal jurisdiction and dismissing the state prosecution on grounds of federal officer immunity under the Supremacy Clause, this court decided *State of North Carolina v. Ivory*, 906 F.2d 999 (4th Cir.1990). Applying the then recently issued decision of the United States Supreme Court in *Mesa v. California*, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), we held that Ivory, another Marine truck driver involved in a fatal vehicular collision with a civilian while driving in convoy, had not established a basis for federal removal jurisdiction of the resulting state criminal prosecution under 28 U.S.C. § 1442(a)(1). As indicated earlier, we find the two cases indistinguishable with respect to the relevant historical facts and procedural incidents that control decision on the jurisdictional issue here.

In *Ivory* as in this case, the defendant was an active-duty Marine who at the time of the accident was driving a truck in convoy under lawful orders of his superior officers. In *Ivory* as in this case, the defendant had a collision with a civilian-operated vehicle under circumstances that arguably involved culpability of the military driver under North Carolina traffic laws. If there is any difference in the essentials of the accidents, it is that Ivory's occurred by virtue of a deliberate act on his part in driving into an intersection believing mistakenly that he had the right of way, while

Cisneros', according to his version, occurred when he drove involuntarily into a civilian vehicle because of a brake failure.

The procedural incidents and histories of the two cases as they came to this court are also indistinguishable in all critical respects. In both, the petitions for removal essentially tracked, as the asserted basis for removal, the language of the removal statute, that the defendant was "act[ing] under color of [his federal] office" at the time in issue, adding in Cisneros' case that he was "acting in reasonable good faith pursuant to a direct order of his superior officer," and suggesting that an "apparent hostile reaction by the state court" might exist in his case and that he "may have been denied due process in being denied appointed counsel and reasonable bond."

In *Ivory*, the state did not timely move for remand, but attacked on appeal the jurisdiction of the federal court on the basis of the evidence adduced at the district court's hearing on the motion to dismiss on federal immunity grounds. In this case, the state first moved for remand, then arguably conceded removal jurisdiction on the district court's hearing of the consolidated motions for removal, for remand, and for dismissal, but then renewed its challenge to subject matter jurisdiction on this appeal following issuance of the *Ivory* decision.

In both cases, evidence adduced on the hearings of the motions to dismiss on immunity grounds established no more than the historical facts above summarized as to each. Essentially, these came in Ivory's case to a finding that his collision resulted from his reasonable, though mistaken, belief that he might enter an intersection without violating state law governing rights of way; in Cisneros' case, to a finding that his collision resulted unavoidably from an unknown defective brake condition.

For the purposes at hand, we take *Ivory* to have established the following principles respecting the removal jurisdiction of federal courts over state prosecutions of federal officers for alleged violations of state traffic laws:

■ 1. The lack of federal removal jurisdiction in such cases is not subject to waiver by the state's failure to move for remand or to attack subject matter jurisdiction at any later stage, but may be noticed by a court at any stage. *Ivory*, 906 F.2d at 1001, n. 2.

■ 2. Where a case has proceeded to judgment of dismissal by a district court on grounds of federal officer immunity, the removal jurisdiction of that court is assessed as of the time of that judgment. *Id.*

■ 3. At that point, the jurisdictional issue is whether the defendant has "present[ed] facts in the record taken as a whole *that would support an immunity defense*," whether or not he earlier had sufficiently averred a colorable defense as the basis for removal under *Mesa*'s removal petition pleading requirement. *Id.* (emphasis added).

■ 4. Most critically, to establish at that point a federal immunity defense— hence federal removal jurisdiction—growing out of an on-duty vehicular traffic accident, a federal officer must show that the accident resulted from an exigency or emergency related to his federal duties which dictated or constrained the way in which he was required to, or could, carry out those duties. Thus, the necessity to exceed a speed limit in order to capture a fleeing felon, or to execute a raid, or the necessity to use a known defective vehicle to complete emergency snow clearing are examples of facts supporting an immunity defense, hence federal jurisdiction, in this type situation. *Id.* at 1002, 1003 (citing cases so holding). But facts which do not reveal any such legitimately constraining duty-related emergency or exigency as the cause of state law violation do not suffice to establish a federal defense, hence a basis for removal jurisdiction. Therefore, in Ivory's case, the mere fact that he mistakenly thought that he safely could enter an intersection while in convoy, being under no duty-related exigency or emergency requiring him to do so, does not suffice. *Id.* at 1003.

## III

█ Under these principles as established in *Ivory*, we must find federal subject matter jurisdiction lacking at the time the district court entered its judgment dismissing the state prosecution in this case. At that time, as in *Ivory*, Cisneros had "failed to present facts in the record taken as a whole that would support an immunity defense." 906 F.2d at 1001, n. 2. Specifically, the facts presented—and found in Cisneros' favor by the district court—did not demonstrate, any more than did those in *Ivory*, an "exigency stemming from the duties of military service or federal employment," *id.* at 1003.

Cisneros contends that there was such an "exigency," if that be required: the exigency created by his failed brakes. That is indeed an exigency, but it is not the type which *Ivory* has identified as central to the federal officer immunity defense. If established, the failed brakes exigency here might well provide a state defense of justification or excuse for allegedly negligent or reckless conduct—by negating the *scienter* element of each of the state offenses charged. But the exigency required under *Ivory*'s test is one which inheres in the very nature and object of the federal duty at issue. Here, for example, had it been established that though these brakes were known to be defective, it was thought necessary by Cisneros' superiors that vital federal interests required that the truck should nevertheless be used to transport military personnel on the tragic trip here, we would have a different case. For the exigency in that situation which would "federalize" the failed-brakes defense would be the exigency which dictated the truck's use rather than the ultimate exigency that the brakes did fail. *See Montana v. Christopher*, 345 F.Supp. 60 (D.Mont.

1972) (federal officer directed by superior to drive vehicle with known defective brakes on emergency snow-clearing mission, immune from state prosecution for ensuing accident caused by failed brakes; cited in *Ivory* as illustrative of "federalizing" exigency).

## IV

One final contention by Cisneros, attempting to distinguish *Ivory*, requires brief consideration.

█ The contention is that removal jurisdiction should be found supportable here on the basis of the removal petition's suggestion of the state court system's hostility to Cisneros, independent of any substantive immunity defense under the Supremacy Clause. The contention is foreclosed by the Supreme Court's decision in *Mesa v. California*, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).

There, the Government had argued for adoption of such a theory of "protective jurisdiction," which would allow removal of state prosecutions of federal officers for any duty-related conduct, even if no federal immunity or other defense was raised, upon a sufficient showing of "state court hostility or interference" with the performance of federal duty. *Id.* at 137, 109 S.Ct. at 969. The Court expressly declined to do so, rejecting this as an independent basis for federal "arising under" jurisdiction in this type case under the present statutory removal provisions. *Id.* at 137–38, 109 S.Ct. at 969–70.[*]

## V

For the above reasons, on the specific authority of *Ivory*, we conclude that the district court was without jurisdiction to

---

[*] Justice Brennan, joined by Justice Marshall, read the majority opinion in *Mesa* as not "foreclos[ing] the possibility of removal" in certain situations of demonstrated "state hostility to federal authority." *Mesa*, 489 U.S. at 140, 109 S.Ct. at 970 (Brennan, J., concurring).

Whether or not a majority of the present Court agrees that the possibility was not foreclosed we think the circumstances envisioned by Justice Brennan involve "hostility" of a quite

different and more egregious form than the sort suggested here. *See id.* (instancing state resistance to federal laws and court decisions in the areas of school desegregation and voting rights).

In any event, we do not think it permissible for us to read *Mesa* as leaving open the possibility that removal might be appropriate on the basis of the sort of local "hostility" averred by Cisneros here.

enter the judgment from which the state appeals. That judgment accordingly is vacated, and the case is remanded to the district court with directions to remand it to the appropriate state court.

SO ORDERED.