The STATE of TEXAS

v.

Curtis J. CARLEY.

No. P–94–CR–25–F.

United States District Court,
W.D. Texas,
Pecos Division.

Dec. 7, 1994.

Court when the acts being performed were done under color of office. After the removal, the State filed a motion to remand the matters back to State court. Then, before the hearing on the State's motion, Carley moved to dismiss the State's complaints pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure. This matter is thus before the Court on the State's motion to remand and Carley's motion to dismiss. For the reasons stated in this Opinion and Order, the Court denies the remand motion, accepts jurisdiction, and grants the dismissal motion.

### Facts

Defendant Carley is presently a National Wetland Inventory Assistant with the U.S. Fish and Wildlife Service in Albuquerque, New Mexico. On Saturday, January 22, 1994, while working under approved compensatory time, Carley was in the field conducting a National Wetlands Inventory ("NWI") field review in the State of Texas. Having driven from Del Rio, Texas that morning, he turned south on Highway 385 at Marathon, Texas. He wanted to view a creek in Brewster County west of Highway 385 to determine if it was a perennial stream. In this part of Texas, commonly referred to as the "Big Bend" area because of the configuration of the nearby Rio Grande, perennial streams are rare; thus, Carley's purpose was to establish whether the creek was accurately depicted on the NWI map.

In traveling to the stream, Carley utilized as his navigational aids (1) the 1990 edition of the "County Maps of Texas" (Brewster County) prepared by the Texas Transportation Planning Division of the State Department of Highways and Public Transportation (the "State Highway Map") and (2) a United States Geological Survey map. The Texas map revealed that there was a State road of some kind (as contrasted with a private road) leading toward the Maravillas Gap Ranch that would provide a view of the creek. Carley therefore turned west on the road until he observed water flowing across the road at the creek. Without exiting the vehicle, he then returned to Highway 385 and drove north to another road with the same designation going east.

Shane Green, Brewster County Atty., Alpine, TX, for plaintiff.

R. Barry Robinson, Steve Jurecky, Asst. U.S. Atty., El Paso, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

FURGESON, District Judge.

The State of Texas, through the office of the County Attorney of Brewster County, brought two criminal trespass complaints against Defendant Curtis J. Carley ("Carley"); an employee of the United States. Carley removed both complaints to this Court pursuant to 28 U.S.C. § 1442(a)(1), which allows federal officers or persons acting under them to remove State criminal prosecutions to a United States District

Carley decided to travel this road going east in order to return by another route to Highway 90 so he could observe the terrain from a different vantage point. Shortly after passing through what appeared to be the headquarters of the Gage Holland Ranch, Carley considered turning around because the road deteriorated. At this point, he was hailed by a ranch representative who informed Carley that he was on a private road. Carley introduced himself, explained his actions and showed the rancher the State Highway Map of Brewster County. The rancher told Carley that the State Map was in error and that the vehicle being used, a minivan, would not be able to traverse the remainder of the road. He also said the next rancher to the north would shoot anyone found trespassing. After receiving the information, Carley apologized for being on the ranch, turned around and departed. He never returned.

Not long thereafter, on March 23, 1994, a misdemeanor information was issued against Carley for criminal trespass on the Gage Holland Ranch in Brewster County. On April 8, 1994, another criminal information was issued against him for criminal trespass on the Combs Ranch in Brewster County. The cases were set for trial in the County Court of Brewster County on May 17, 1994. On May 13, 1994, the United States Attorney for the Western District of Texas filed a Notice of Removal of the cases from Brewster County to this Court pursuant to 28 U.S.C. § 1442(a)(1), because the cases were criminal actions commenced against an officer of the United States, Defendant Carley, for actions taken under color of his office. The two cases were consolidated into this one case.

On June 6, 1994, the County Attorney of Brewster County filed a Motion to Remand the criminal prosecutions back to County Court, contending that there was no federal interest or immunity implicated in the State court prosecution. After responding to the Motion to Remand, Carley filed a Motion to dismiss under Rule 12(b) of the Federal Rules of Criminal Procedure on the ground that the doctrine of federal supremacy bars this action and therefore that Carley is immune from prosecution. A hearing on all motions was held on August 18, 1994, in Pecos, Texas.

### Motion to Remand

In connection with a motion to remand, "the burden is on the party seeking to preserve the removal, not the party moving for remand, to show the requirements for removal have been met." CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, 14A FEDERAL PRACTICE AND PROCEDURE § 3739 (1985). Utilizing the standard, this Court considered the declaration of Carley summarized above in the factual statement. It also considered the declaration of Kenneth R. Russell, a Deputy Assistant Regional Director in the Ecological Services program for the U.S. Fish and Wildlife Service, who confirmed that Carley was within the course and scope of his employment with the Federal government during the incident in question, and the declaration of Warren W. Hagenbuck, Regional Coordinator for National Wetlands Inventory in Region 2 of the U.S. Fish and Wildlife Service, who confirmed the procedures utilized by NWI assistants to accomplish their work. It further considered the testimony at the hearing on the motion of Tom O. Conner who served as County Judge of Brewster County from 1982 to 1992. Finally, it considered the State Highway Map, which was admitted into evidence at the hearing on the motion as Exhibit 1.

Appropriate removal of a State action by a federal officer under 28 U.S.C. § 1442(a) requires the enunciation of a federal defense by one who is a federal officer or acting under the authority of a federal officer. *Mesa v. California*, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). In the instant case, there is no question that Carley, in his capacity as an employee of the U.S. Fish and Wildlife Service, was an officer of the United States or a person acting under the authority of an officer of the United States, as required by § 1442(a). Hence, the only issue before this Court as to the question of remand is whether Carley has enunciated a federal defense.

Fortunately, there is authority, albeit over a century past, directly in point. In

1867, in *The Mayor v. Cooper,* 73 U.S. (6 Wall) 247, 18 L.Ed. 851 (1867), the Supreme Court examined a case involving criminal trespass and removal. The case arose in the aftermath of the Civil War. Cooper apparently was a landowner in Nashville. After the mayor and alderman of Nashville entered his property, Cooper brought trespass charges against them in State court. The defendants removed the case to federal court, alleging that "the trespasses complained of, if committed, were committed during the rebellion by authority of the President of the United States, under an order issued by General G.H. Thomas, an officer of the United States, holding command of the district within which the trespasses are alleged to have occurred ..." 73 U.S. at 248. The trial court did not accept the removal but instead dismissed it and declared unconstitutional the statute allowing removal for acts committed under the authority of the Union Army during the Civil War. On appeal, the Supreme Court, in a short but eloquent opinion by Justice Swayne, overruled.

Justice Swayne began his opinion by noting that the Court had not been provided the opinion of the lower court and was "therefore at a loss to imagine what train of reasoning conducted the learned judge to the conclusion announced in the order ..." 73 U.S. at 250. Given that opening, it is not surprising that Justice Swayne then proceeded to decide in short order that the statute was in fact constitutional and that removal was appropriate. He declared that a colorable defense was raised under federal law in that the defendants were on Cooper's land because they were complying with the dictates of the federal law, as ordered by a military commander. A federal defense to trespass was stated; removal was therefore appropriate.

Likewise, in this case, the exact same colorable defense to trespass has been raised: Carley was on the roads in question to comply with the dictates of the federal law requiring a National Wetlands Inventory, as ordered by his supervisors. Both Carley's declaration and the declaration of his superiors clearly support this proposition. Under the circumstances, Carley certainly carried his burden to preserve the removal.

In rebuttal, the County Attorney of Brewster County called a former Brewster County Judge, Tom O. Conner, to testify at the hearing. Judge Conner opined that the roads in question were private roads but, on cross-examination, admitted that the State Highway Map showed the roads to be public rather than private. His only explanation for this confusing situation was that State officials preparing the State Highway Map simply failed to coordinate their geographical efforts with county officials; therefore, the maps were wrong and had no force and effect in Brewster County. It is unclear if Brewster County plans to try to correct this problem by addressing the issue with the State of Texas or simply plans to allow the matter to remain in this unfortunate condition. Nevertheless, in the end, Judge Conner's testimony actually bolsters Carley's declaration, at least as to the designation of the roads on the State Highway Map, and does not refute any of the declaration, especially as to the purpose for Carley's trip. The thrust of Carley's factual presentation is thus not negated in any way.

The County Attorney also tried to draw comfort from Justice O'Connor's opinion in *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), arguing that, since no federal defense was found in *Mesa,* no federal defense could be found in the instant case, either. She misinterprets *Mesa,* however, because a correct reading of the opinion actually supports Carley's position that he had a federal defense to the State prosecution. For example, in *Mesa,* Justice O'Connor cited *The Mayor* with approval:

> In upholding the statute's constitutionality, we observed: 'Nor is it any objection that questions are involved which are not all of a Federal character. If one of the latter exist, if there be a single such ingredient in the mass, it is sufficient. *That element is decisive upon the subject of jurisdiction.'* [73 U.S.] 6 Wall., at 252 (emphasis added). For purposes of removal, we only required the mayor and aldermen to allege a colorable defense under federal law; '[t]he va-

lidity of the defence authorized to be made is a distinct subject. It involves wholly different inquiries.... It has no connection whatever with the question of jurisdiction.' *Id.*, at 254.

489 U.S. at 129, 109 S.Ct. at 964.

Moreover, it matters not that the Supreme Court in *Mesa* found that no federal defense was stated, because the factual differences are significant between the instant case and *Mesa*, where postal employees attempted to remove their traffic cases from State court. As Justice Brennan pointed out in his concurring opinion in *Mesa*, in "most routine traffic accident cases like those presented here, no significant federal interest is served by removal; it is, accordingly, difficult to believe that Congress would have intended the statute to reach so far." 489 U.S. at 140, 109 S.Ct. at 970.

The reverse is true here. This case personifies the type of prosecution for which the removal statute was drafted. Justice Swayne explained it well in *The Mayor*, 73 U.S. at 253:

It is the right and the duty of the national government to have its Constitution and laws interpreted and applied by its own judicial tribunals. In cases arising under them, properly brought before it, this court is the final arbiter. The decisions of the courts of the United States within their sphere of action, are as conclusive as the laws of Congress made in pursuance of the Constitution. This is essential to the peace of the nation, and to the vigor and efficiency of the government. A different principle would lead to the most mischievous consequences. The courts of the several States might determine the same questions in different ways. There would be no uniformity of decisions. For every act of an officer, civil or military, of the United States, including alike the highest and the lowest, done under their authority, he would be liable to harassing litigation in the State courts. However regular his conduct, neither the Constitution nor laws of the United States could avail him, if the views of those tribunals and of the juries which sit in them, should be adverse.

The authority which he had served and obeyed would be impotent to protect him. Such a government would be one of pitiable weakness, and would wholly fail to meet the ends which the framers of the Constitution had in view. They designed to make a government not only independent and self-sustained, but supreme in every function within the scope of its authority. The judgments of this court have uniformly held that it is so.

The import of Justice Swayne's words is clear. "Mischievous consequences" would arise if the County Attorney of Brewster County were free to prosecute every federal official traveling in her jurisdiction under the circumstances here. No county official in any State should have the power to inhibit the proper implementation of federal laws by federal officials at her discretion. Our nation decided over 200 years ago that we did not want our system to work that way. For that reason, the State's motion to remand is denied.

### Motion to Dismiss

■ Carley's Motion to Dismiss is filed pursuant to Federal Rule of Criminal Procedure 12(b) which states that any defense which is capable of determination without the trial of the general issue may be raised before trial by motion. The "Notes of Advisory Committee on Rules" explain that such a defense includes immunity. To analyze the legal issue raised by Carley, the Court finds helpful the case of *Commonwealth of Kentucky v. Long*, 837 F.2d 727 (6th Cir.1988), which involved extensive consideration of federal supremacy immunity.

*Long* dealt with the state prosecution of an agent of the Federal Bureau of Investigation who had worked with an informant who had, in turn, committed burglaries as a part of his "cooperation with law enforcement." The agent knew and approved of the planning and execution of the burglaries. 837 F.2d at 736. Based on this involvement, Kentucky indicted the agent for burglary. After removal to federal court, the agent moved to dismiss the criminal action pursuant to Rule 12(b). After a hearing, the district court granted the motion to dismiss. The Sixth

Circuit affirmed. In reviewing the authorities, the Sixth Circuit observed that a "two-part test determines whether or not a state court has jurisdiction to prosecute a federal agent for conduct facially violative of a state's criminal code." The first part of the test is whether "the federal agent was performing an act which he was authorized to do by the law of the United States." The second part is whether "in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do." 837 F.2d at 744.

Utilizing this two-part test to analyze Carley's Motion to Dismiss, the Court is convinced that dismissal is appropriate in the instant case. As to the first part of the *Long* test, it is clear that Carley was performing an act which he was authorized to do by the law of the United States. He was conducting an NWI field review in the State of Texas. He was, at all times relevant to this matter, acting within the course and scope of his employment with the United States Fish and Wildlife Service, according to the Declaration of Kenneth R. Russell, Deputy Assistant Regional Director, Fish and Wildlife Enhancement, U.S. Fish and Wildlife Service, Region II.

Not only is the first part of the *Long* test satisfied in this case; the second part is satisfied as well. Carley did no more than what was necessary and proper for him to do. In conducting the NWI field review, he was attempting to observe streams which were required to be inventoried by traveling on roads which were marked on the State Highway Map as public roads. He remained on the roads in questions at all times and departed immediately after being asked to leave. At no time did he divert from his duties. Under the circumstances, if the FBI agent in *Long* was entitled to immunity, even though he was knowingly involved in violations of Kentucky law, then there is all the more reason to grant Carley immunity, when he had no knowledge that he was involved in violations of Texas law. In fact, it is difficult to ascertain how any reasonable person traveling as Carley did would have been able to divine a trespass in this instance. A look at the facts and the law certainly does not reveal an obvious (or for that matter, even a possible) trespass under Texas law.

■ The Texas criminal trespass statute is set forth in Section 30.05 of the Texas Penal Code. It provides that a person commits a trespass if he enters or remains on the property of another without effective consent and he had either (1) notice that the entry was forbidden, or (2) received notice to depart but failed to do so. Tex.Penal Code Ann. § 30.05(a) (Vernon 1994). The requisite mental element for criminal trespass is intent, knowledge or recklessness. *See* Tex.Penal Code Ann. § 6.02 (Vernon 1994); *Holloway v. State,* 583 S.W.2d 376, 377 (Tex. Crim.App.1979).

■ Based upon the declarations on file, none of which can be refuted in their essential elements by the State, it certainly appears that Carley did not have notice that his travel on the roads in question was forbidden. As Regional Coordinator Hagenbuck declared, when NWI personnel have a question about the status of a road which must be traveled to accomplish their duties, they are instructed to rely primarily on published state and/or county road maps to determine whether the road is public or private. Here, Carley did just that by referring to the State Highway Map, which indicated the roads in question were public. Hagenbuck further noted that often public and private roads, both in Texas and throughout the West, are the same width, have gates and cattle guards, and are maintained to the same degree. Certainly, based on the state of the record, Carley had no notice that his travel on the roads in question was forbidden.

Secondly, there is no proof that Carley refused to leave after receiving notice to depart, whether that notice was proper or not. In fact, the record is very clear that when he was requested to turn around and leave, he did so immediately. Therefore, it appears that one could conclude, even as a matter of law, that Carley did not intentionally, knowingly or recklessly refuse to leave after receiving proper notice to depart. *See Bustillos v. State,* 832 S.W.2d 668, 675 (Tex. App.—El Paso 1992, pet. ref'd) (noting that "a defendant could be properly convicted of criminal trespass even though the entry upon

the property was by either accident or mistake, upon subsequent proof that defendant then intentionally, knowingly or recklessly refused to leave after receiving proper notice to depart"). In sum, there is nothing in the record that could raise any question about improper intent, knowledge or recklessness on Carley's part relating to trespass. An official map of the State of Texas guided his travels; it declared the roads in question to be public. If the map is wrong, it is not Carley's fault. It is a matter for resolution between the State of Texas and Brewster County. Accordingly, under Rule 12(b) of the Federal Rules of Criminal Procedure, the defense of immunity is capable of determination without trial and is established by the record. Thus, dismissal is proper and Carley's motion is therefore granted.

### Unresolved Concerns
#### 1. First Concern

At the hearing in this case, the County Attorney of Brewster County promised to continue her prosecution of federal officials traveling in Carley's steps. She even promised to charge the Court with criminal trespass if he ventured into Brewster County on less traveled roads. There are, of course, several ways for the Court to view her words. One is that she truly meant what she said and now plans to thwart the legitimate activities of the federal government in Brewster County. However, it is inconceivable to the Court that, in this day and time, any state official would undertake such an unwise course of action. The Court is simply not ready to conclude, quite yet, that the County Attorney is bent on forsaking her sworn duty to uphold the Constitution by prosecuting every federal official, be they a United States District Judge or otherwise, who travels onto the roads of Brewster County utilizing as navigational aids official maps of the State of Texas.

Under the circumstances, the Court has decided that the County Attorney of Brewster County spoke in the heat of the moment at the hearing, without truly intending to do what she said. It is thus anticipated that she will do her duty and follow the great tradi-

tions of Texas prosecutors, who have been second to none in doing their duty. To anticipate otherwise would require the Court to assume too much perversity and mischievousness on the part of the County Attorney of Brewster County. The Court is not yet ready to reach such a conclusion.

#### 2. Second Concern

The real problem presented here, however, is not whether the County Attorney will continue prosecuting cases like this one, because she simply won't. Instead, the real problem is whether Brewster County will take steps to resolve its map controversy with the State of Texas. Failure to do so raises grave concerns. The record already indicates how seriously Brewster County landowners view trespassers, whether they are indeed trespassers or not. The traveling public is equally serious about its access to public roads. Moreover, travelers have every right to rely on official state maps to guide their journeys. The only exception to the rule appears to exist in Brewster County. In this case, Carley's actions were in every way prudent and cautious. In the next case, a Brewster County traveler might not be imbued with Carley's prudence and caution. In fact, the expectation should more likely be just the opposite, in light of what we know from human experience, as taught both by literature and by life.

UNCLE ABNER [1] is an apt example from literature. Chapter Seven begins thusly:

> It was a strange scene that we approached. Before a crossroad leading into a grove of beech trees, a man sat on his horse with a rifle across his saddle. He did not speak until we were before him in the road, and then his words were sinister.
>
> "Ride on!" he said.
>
> But my Uncle Abner did not ride on. He pulled up his big chestnut and looked calmly at the man.
>
> "You speak like one having authority," he said.
>
> The man answered with an oath.
>
> "Ride on, or you'll get into trouble!"

---

1. MEVILLE DAVISSON POST, UNCLE ABNER MASTER OF MYSTERIES, THE TWILIGHT ADVENTURE at 95 (1962).

"I am accustomed to trouble," replied my uncle with great composure; "you must give me a better reason."

"I'll give you hell!" growled the man. "Ride on!"

Abner's eyes traveled over the speaker with a deliberate scrutiny.

"It is not yours to give," he said, "although possibly to receive. Are the roads of Virginia held by arms?"

"This one is," replied the man.

"I think not," replied my Uncle Abner, and, touching his horse with his heel, he turned into the crossroad.

Even today, Uncle Abner's insistence on the right to travel on public roads is understandable. Although prudence would dictate caution, especially in the face of weapons, officials responsible for peaceful travel on public roads should not assume prudence will prevail when rights are not clearly defined.

While Uncle Abner's example serves as a reminder about how seriously all Americans view interference with travel, an incident from the life of Sam Houston exemplifies that seriousness on the part of Texans. Although Houston served in more Texas leadership roles than anyone in history, it was not until just before the Civil War that he served as the State's Governor. When Texas decided to join the Confederacy, he refused to sign the articles of secession and soon thereafter was either convinced or required to leave the governor's mansion by an outraged citizenry. Never one to quit a good fight, he later decided to travel through Texas to urge Texans to withdraw from the Confederacy. During his travels, this story was told:

> General Houston's personal popularity continued to mend. The enduring affection that Texas held for Sam Houston despite its fits of temper and his; the tradition of sovereignty of which Houston was the personification; the lynx-fox game at which the old General continued to ply his practised hand—these considerations were not to be resisted. A blunder on the part of the Confederate Government also had its effect. Richmond sent a General Hebert to command the military department of Texas. He proclaimed martial law and covered the state with provost marshals clothed in despotic power. Passports to travel on the highways were required of all citizens over seventeen years of age. One energetic guardian of the public safety took it upon himself to halt Sam Houston's top buggy.
>
> "San Jacinto is my pass through Texas!" was the response he got.
>
> The story was repeated with relish, and the top buggy was on the roads more than ever.[2]

Today, no pass is required to travel the public roads and highways of Texas. Indeed, Texans take pride in an outstanding highway system, mapped in excellent detail and open to all travelers. When those travelers are traversing on those public roads and highways, it should not take a federal judge to decide whether the State's trespass law is being violated, but a problem does arise when State officials argue about whether roads are truly public or not, as is the case here. The potential for disaster is real, especially if some latter-day Abner or Houston confronts a Brewster County landowner blocking a road. This Court has no authority to intervene in this controversy over the status of Brewster County roads; clearly, it would not be proper to do so. Still, it is not inappropriate for this Court to call on the good judgment of public officials to address the controversy; therefore, the call is hereby made.

*Postscript*

One last word. No criminal prosecution is a laughing matter. None of the participants in this case took it as a laughing matter. Yet, court observers can remind us that serious legal issues sometimes have a funny side. The attached political cartoon, drawn by Gary Oliver for the *Big Bend Sentinel* in Marfa, Texas, is just such an instance.

2. MARQUIS JAMES, THE RAVEN at 421 (1929).