KINETIC SYSTEMS, INC., Plaintiff,

v.

FEDERAL FINANCING BANK and Does 1 through 25, Defendants.

Case No. 12–1619–SC.

United States District Court, N.D. California.

Sept. 14, 2012.

984

Mathew R. Troughton, Scott E. Hennigh, San Francisco, CA, for Plaintiff.

Steven J. Saltiel, San Francisco, CA, for Defendants.

*ORDER DENYING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S MOTION TO DISMISS*

SAMUEL CONTI, District Judge.

## I. INTRODUCTION

This lawsuit stems from the closure of Solyndra, a Fremont, California-based maker of solar panel technology. In September 2009, the U.S. Department of Energy ("DOE"), Solyndra, and Defendant Federal Financing Bank ("FFB") entered into a series of agreements by which FFB, at the behest of DOE, purchased from Solyndra a promissory note in the amount of $535 million. DOE guaranteed the note. Solyndra used these funds to begin construction on a manufacturing facility (the "Project"), but, in August 2011, before the facility opened, Solyndra abruptly closed.

Plaintiff Kinetic Systems, Inc. ("Plaintiff") is a California contractor. Plaintiff alleges that it performed $2.870 million worth of work on the Project and is still owed roughly $1.187 million. After Solyndra closed, Plaintiff served a bonded stop notice on FFB—that is, it claimed a right to be paid out of excess construction funds allegedly held by FFB. When FFB did not pay, Plaintiff sued FFB in California state court for enforcement of the bonded stop notice, whereupon FFB removed to this Court.

Two motions are now pending, both fully briefed and suitable for decision without oral argument. The first motion, filed by Plaintiff, asks the Court to remand this action to state court. ECF Nos. 10 ("MTR"), 30 ("MTR Opp'n"), 31 ("MTR Reply"). The second motion, filed by FFB, asks the Court to dismiss the case

under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, or, in the alternative, to enter summary judgment in favor of FFB. ECF Nos. 6 ("MTD"), 19 ("MTD Opp'n"), 28 ("MTD Reply"). FFB has moved for dismissal under Rule 12(b)(1) because it asserts the defenses of sovereign immunity and conflict preemption, which are jurisdictional in nature. As for the summary judgment portion of its motion, FFB argues that it is not a "construction lender," as California law defines that term. The question of whether California's stop-notice laws reach FFB appears to be one of first impression, as neither party has cited any case directly addressing the point, nor is the Court aware of any.

For the reasons set forth below, the Court DENIES Plaintiff's motion to remand because FFB has a "colorable federal defense," *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir.2006), namely, the federal defenses raised in its Rule 12(b)(1) motion. The Court, however, DENIES FFB's Rule 12(b)(1) motion: Though FFB's jurisdictional defenses are "colorable" for purposes of removal, they are not meritorious. The Court also denies FFB's request for summary judgment because FFB has not shown that it falls outside California's definition of a "construction lender."

## II. BACKGROUND

Understanding this dispute requires an understanding of: the nature of FFB; the framework of the program by which FFB provided financing guaranteed by DOE; and the details of the particular arrangement between Solyndra, DOE, and FFB. The Court reviews those topics before recounting the events that led Plaintiff to issue a bonded stop notice to FFB and hence to this lawsuit.

### A. FFB

Nearly forty years ago, Congress created FFB by passing the Federal Financing Bank Act of 1973, Pub.L. No. 93–224, 87 Stat. 937 (1973) ("FFB Act"), codified at 12 U.S.C. § 2281 *et seq.* Congress found that "demands for funds through Federal and federally assisted borrowing programs [were] increasing faster than the total supply of credit and that such borrowings [were] not adequately coordinated with overall Federal fiscal and debt management policies." 12 U.S.C. § 2281. Federal agencies administering increasingly popular loan-guarantee programs were using private lenders to furnish the loans, which had the unintended effect of increasing costs to the federal government and disrupting private finance markets. *See generally* Willis–Proctor Decl. Ex. 6 ("McNamar Report") at 8–10, 12–17.[1] The purpose of the FFB Act was "to assure coordination of these programs with the overall economic and fiscal policies of the Government, to reduce the cost of Federal and federally assisted borrowings from the public, and to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281.[2] Congress es-

---

1. In support of its motion to dismiss, FFB submitted the declaration of Cherisse Willis–Proctor, a records officer within the U.S. Department of Treasury who has supplied as exhibits certified copies of various agreements relevant to the case. ECF No. 7 ("Willis–Proctor Decl."). Exhibit 6 contains a statement made to the House Ways and Means Committee on May 12, 1983 by Deputy Secretary of the Treasury R.T. McNamar, in which

Deputy Secretary McNamar explained, among other things, the background and purposes of FFB.

2. *See also Pealo v. Farmers Home Admin.*, 412 F.Supp. 561, 563 (D.D.C.1976) *rev'd* 562 F.2d 744 (D.C.Cir.1977) (Congress established FFB "to provide a source of funds for Federal agencies so as to lessen competition among the agencies in the private money market and

tablished FFB as a "body corporate ... subject to the general supervision and direction of the Secretary of the Treasury" and made it "an instrumentality of the United States Government." 12 U.S.C. § 2283.

Congress conferred on FFB a number of general powers. *Id.* § 2289. One of these is the power "to sue and be sued, complain, and defend, in its corporate name." *Id.* § 2289(1). Another is the power "to enter into contracts, to execute instruments to incur liabilities, and to do all things as are necessary or incidental to the proper management of its affairs and the proper conduct of its business." *Id.* § 2289(9). One of the functions of FFB is to purchase or sell any obligation issued, sold, or guaranteed by a federal agency. *Id.* § 2285(a). "Obligation" is a defined term that includes "any note, bond, debenture, or other evidence of indebtedness," with certain exceptions not relevant here. *Id.* § 2282(2). FFB often exercises its power to purchase obligations in order to serve as a lender for programs wherein a federal agency (for example, DOE) guarantees a loan to a private entity (for example, a builder of electrical infrastructure). Generally, FFB provides the financing by purchasing a note which the federal agency then guarantees.[3]

## B. *The Solyndra Financing Arrangement*

The Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 594 (2005) ("Energy Policy Act"), codified at 42 U.S.C. § 16511 *et seq.*, authorizes the Secretary of Energy ("Secretary") to guarantee loans for cer-

tain eligible projects, and appropriates funds to cover the costs of such guarantees. *See* 42 U.S.C. §§ 16511–14. When the Secretary guarantees 100 percent of a loan, the loan must be funded by FFB (as opposed to a private bank). *See* 10 C.F.R. § 609.10(d)(4)(i).

In September 2009, FFB and the Secretary entered into a Program Financing Agreement that supplies the general framework for this financing program. *See* Willis–Proctor Decl. Ex. 1 ("PFA"). The financing process begins when the Secretary designates a borrower. *See id.* § 2.1. The Secretary's formal designation of a borrower places the Secretary and FFB under three separate commitments: (a) FFB and the Secretary must sign "a Note Purchase Agreement with the particular Borrower ... setting forth the terms and conditions under which FFB will purchase a Note issued by such Borrower"; (b) the Secretary must guarantee the note pursuant to the Energy Policy Act; and (c) FFB must purchase the note pursuant to the FFB Act. *Id.* § 2.3. Note Purchase Agreements signed by FFB and designated borrowers require the borrower to offer a promissory note to FFB, which FFB then buys, assuming certain preconditions are satisfied. *Id.* §§ 1.1, 4.1. One of those preconditions is the receipt by FFB of the Secretary's guarantee of the note in the event that a borrower defaults.

The PFA provides that the note shall be a future advance promissory note. *Id.* § 1.1 (definition of "Note"). The amount of the note represents the maximum amount of financing that a borrower may

---

to provide lower interest cost to the United States.").

**3.** *E.g., Californians for Renewable Energy v. U.S. Dept. of Energy,* 860 F.Supp.2d 44, 45–47 (D.D.C.2012); *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.,* 8:08CV48, 2011 WL 976482, at *2 (D.Neb. Mar. 15, 2011);

*Great Plains Gasification Assocs. v. C.I.R.,* 92 T.C.M. (CCH) 534 (T.C.2006); *Brazos Elec. Power Co-op, Inc. v. United States,* 49 Fed.Cl. 398, 400 (Fed.Cl.2001); *Resolution Trust Corp. v. California,* 851 F.Supp. 1453, 1455 n. 1 (C.D.Cal.1994); *Mason Cnty. Med. Ass'n v. Knebel,* 563 F.2d 256, 260 (6th Cir.1977).

receive under their particular PFA. Form NPA § 7.3.4.[4] The borrower receives the financing by requesting an advance on the note. *Id.* § 7.2. The borrower usually must specify a third party to receive the advance; in other words, FFB gives money to the borrower's creditors, not to the borrower itself. *Id.* § 7.2(b).[5] The Secretary must approve each request before FFB will disburse the advanced funds. *Id.* § 7.2(a). Advances may be made "only at such time and in such amount as shall be necessary to meet the immediate payment or disbursing need of the Borrower." *Id.*

On September 2, 2009, Solyndra, DOE, and FFB entered into a Note Purchase Agreement. Willis–Proctor Decl. Ex. 2 ("Solyndra NPA"). Under the terms of the Solyndra NPA, Solyndra agreed to offer FFB a note in the amount of $535 million. The Secretary guaranteed the note and FFB purchased it. The terms of the Solyndra NPA tracked the general terms set forth above. That is, the Secretary guaranteed a $535 million note offered by Solyndra and purchased by FFB, against which note Solyndra could request advances of funds which, if approved by the Secretary, FFB would pay directly to Solyndra's creditors according to its "immediate payment or disbursing needs[s]," up to an aggregate maximum of $535 million and repayable with interest.

### C. *Plaintiff's Stop Notice*

The Court takes this portion of its account from the allegations in Plaintiff's state court complaint and FFB's notice of removal. ECF No. 1 (notice of removal ("NOR")) Ex. A ("Compl."). Plaintiff is a California corporation and duly licensed contractor. Compl. ¶ 1. Plaintiff alleges that FFB acted as a "construction lender" to Solyndra with regard to construction of Solyndra's manufacturing facility at 47488 Kato Road, Fremont, California. *Id.* ¶ 8. Plaintiff "furnished labor, services, equipment and material for the installation of mechanical piping and components (HVAC, plumbing, process) for tool hookup … pursuant to written contract with Solyndra." *Id.* ¶ 9. Before its closure, Solyndra issued purchase orders to Plaintiff for work valued at $2,967,762. *Id.* Plaintiff allegedly completed $2,870,372 worth of work on those orders. *Id.* Plaintiff received partial payment on those purchase orders in the amount of $1,682,422, leaving an unpaid balance of $1,187,950, plus interest. *Id.* ¶ 10. Solyndra suspended operations on August 31, 2011, while work on the Project was still ongoing. *Id.* ¶ 11. In January 2012, Plaintiff served FFB with a bonded stop notice.[6] *Id., id.* Ex. A ("Stop

---

4. The Willis–Proctor Declaration has several exhibits, the first of which is the PFA; the PFA, in turn, has several Annexes consisting of form examples of documents required by the PFA. Annex 3 to the PFA is a form Note Purchase Agreement ("Form NPA").

5. The PFA makes an exception for "[a]dvances to reimburse the Borrower for expenditures that it has made from its own working capital." Form NPA § 7.2(b).

6. A stop notice is "a notice by one who has furnished materials or labor for the construction of improvements, given to the owner of the property, or to a lender of funds to be used for payment of claims against such property, for the purpose of withholding money in the hands of such owner or lender from the contractor so that the materialman or laborer may be paid for his material or services." *See Flintkote Co. v. Presley of N. California,* 154 Cal.App.3d 458, 462, 201 Cal.Rptr. 262 (Cal.Ct.App.1984) (citing *Theisen v. Cnty. of Los Angeles,* 54 Cal.2d 170, 177–179, 5 Cal. Rptr. 161, 352 P.2d 529 (Cal.1960)); *see also* Miller & Starr, 10 *Cal. Real Est.* § 28:78 (3d ed.) ("Miller & Starr"). A bonded stop notice is a stop notice supported by a bond of 125 percent of the amount of the claim contained in the stop notice. Miller & Starr, *supra,* § 28:84. Generally, compliance with a bonded stop notice is mandatory, while compliance with a non-bonded stop notice is permissive. *Manos v. Degen,* 203 Cal.App.3d 1237, 1240, 250 Cal.Rptr. 493 (Cal.Ct.App. 1988) (citing Cal. Civ.Code § 3162, *repealed*

Not."). FFB refused to set aside funds to satisfy the stop notice. *Id.* ¶ 17.

On or around February 28, 2012, Plaintiff sued FFB in Alameda County Superior Court for enforcement of the bonded stop notice. Compl. at 1 (state court case number RG12618947). On March 13, the United States Attorney's Office received copies of the state court summons and complaint from the U.S. Department of Treasury. NOR ¶ 4. On April 2, FFB removed the case from state court to this Court, citing, inter alia, the federal-agency removal statute, 28 U.S.C. § 1442.[7] NOR ¶ 5. On April 23, FFB moved to dismiss the case and, on May 2, Plaintiff moved to remand the case back to state court. FFB's motion to dismiss argues that Plaintiff's claim must fail for three reasons: (1) it is barred by the doctrine of sovereign immunity, (2) it conflicts with and therefore is preempted by federal law, and (3) in the alternative, treating the motion as one for summary judgment, the evidence shows that FFB is not a "construction lender" under California law and therefore is not bound by Plaintiff's stop notice. FFB stated none of these defenses in its notice of removal. *Compare* MTD *with* NOR.[8]

by Stats. 2010, c. 697 (S.B.189) § 16, operative July 1, 2012); *see also* Cal. Civ.Code § 8536(b) (covering former § 3162). Certain revisions to California's stop-notice laws took effect on July 1, 2012, during the pendency of this motion. The revisions mainly restyled and renumbered the applicable sections of the California Civil Code, and do not substantively change the law applicable to this case. *See* 44 *Cal. Jur.3d* § 69 (section on mechanics' liens and stop notices setting forth definitions which apply under either pre- or post-revision code).

7. A civil action … that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: [¶] The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.
28 U.S.C. § 1442(a)(1).

8. Here is the substantive portion of FFB's notice of removal:
 1. On February 28, 2012, [Plaintiff] filed a complaint to enforce bonded stop notice in Alameda County Superior Court. Plaintiff seeks $1,187,950.00 together with prejudgment interest.
 2. Plaintiff alleges that [Defendant] acted as a "construction lender," as that term is defined under the California Civil Code, to

Solyndra, a manufacturer of solar panel products, with regard to the construction of a work of improvement known as the Solyndra solar manufacturing facility (the "Project"). Plaintiff further alleges that [Defendant] was holder of construction funds allocated to the Project.
 3. Plaintiff alleges that it furnished labor, services, equipment and material for the installation of mechanical piping and components for tool hookup as part of the Project pursuant to written contract with Solyndra. Plaintiff claims Solyndra made partial payment for the work Plaintiff provided, but on August 31, 2011, Solyndra announced it was closing its business, and did so without paying Plaintiff all of the amounts due and unpaid.
 4. On March 13, 2012, the United States Attorney's Office received copies of the Alameda County Superior Court summons and complaint from the U.S. Department of Treasury, which are attached as Exhibit A pursuant to 28 U.S.C. § 1446(a), and which constitute the only process or pleading which have been received. We are advised that an FFB employee received the summons and complaint via U.S. Mail on March 7, 2012. The Summons and Complaint has not yet been served on the United States Attorney's Office as required by Rule 4(i)(1)(A)(i)(ii), Fed. R. Civ. Proc. No trial is scheduled on this case.
 5. This action must be removed to federal district court pursuant to 28 U.S.C. §§ 1442(a)(1) [sic] because it is a civil action against an agency and instrumentality of the United States Government. This action may also be removed to federal district

## III. DISCUSSION

### A. Motion to Remand

■ FFB removed this case from state to federal court on the basis of the federal-agency removal statute, 28 U.S.C. § 1442.[9] See NOR ¶ 5. While the general removal statute, § 1441, is strictly construed to favor remand, § 1442 is broadly construed to favor removal. Durham, 445 F.3d at 1252–53. This presumption furthers one of the key purposes of the statute: to provide federal defendants who have been haled into state court for acts done in the name of the federal government with an opportunity to have the validity of defenses based on federal law heard in a federal forum. See Willingham v. Morgan, 395 U.S. 402, 406–07, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); see also Durham, 445 F.3d at 1252–53 (alluding to long history of federal agents "get[ting] into trouble when they act within the States—whether they're enforcing unpopular tariffs in South Carolina in the 1830s, killing recalcitrant moonshiners in self-defense in Tennessee in the 1880s, or exposing servicemen to asbestos to make military aircraft in the 1970s"). The Supreme Court has cautioned lower courts not to frustrate this purpose with "a narrow, grudging interpretation" of § 1442. Willingham, 395 U.S. at 407, 89 S.Ct. 1813.

■ Aided by this presumption, a federal defendant removing under § 1442 must demonstrate three things: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions ... and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham, 445 F.3d at 1251. Plaintiff does not challenge FFB on the first two criteria.[10] See Reply at 3. Neither does Plaintiff dispute that FFB can assert a colorable federal defense. See id. Indeed, it would be difficult to do so credibly, given that FFB has raised two colorable federal defenses in its motion to dismiss. MTD at 7–10 (sovereign immunity), 10–13 (conflict preemption). Rather, Plaintiff argues that remand is necessary because FFB failed to state the grounds of removal—that is, it failed to articulate its federal defenses—in the notice of removal itself. Relying on

court pursuant to 28 U.S.C. § 1331 (civil actions arising under the Constitution, laws or treaties of the United States), and other applicable authorities.

9. FFB's notice of removal also alludes to § 1331 (the federal-question original-jurisdiction statute) and unspecified "other applicable authorities." NOR ¶ 5. As FFB appears to concede, see MTR Opp'n at 5, these are insufficient grounds for removal. Section 1331 pertains to original jurisdiction, not removal jurisdiction. Nor does § 1331 provide a basis for removal under the general removal statute, § 1441, since Plaintiff's complaint sets forth only a state-law claim and does not raise a federal question. Hence, because this Court could not have had original jurisdiction over Plaintiff's claim, FFB cannot remove under § 1441. See, e.g., Regal Stone Ltd. v. Longs Drug Stores California, L.L.C., 881 F.Supp.2d 1123, 1125–27, 2012 WL 685756, at *2 (N.D.Cal.). As to the "other" authorities mentioned in FFB's removal notice, FFB has not identified them and the Court deems that ground abandoned.

10. The Court is satisfied that the first two Durham criteria are met. FFB is a "person" within the meaning of § 1442. See 12 U.S.C. § 2283 (FFB is a federal corporation); 1 U.S.C. § 1 (in statutes, the word "person" presumptively includes corporations); Isaacson v. Dow Chem. Co., 517 F.3d 129, 135–36 (2d Cir.2008) (nothing in § 1442 indicates intent to overcome presumption that person includes corporations). There also is a "causal nexus" between FFB's acts and Plaintiff's claim: As FFB acknowledges, the Solyndra loan was "a perfect example of how Congress intended the FFB to work," MTD Reply at 12, and in taking the actions giving rise to Plaintiff's claim, FFB clearly acted under color of office. Durham also requires that FFB have a colorable federal defense. As explained more fully herein, FFB does have such defenses. They are set forth in FFB's motion to dismiss.

the Supreme Court opinion *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), Plaintiff argues that a federal defendant's failure to state its federal defenses in the notice of removal itself, as compared to some other paper, strips the federal court of the removal jurisdiction granted by § 1442. MTR Reply at 3–5.

This position misapprehends the holding of *Mesa.* In that case, the government argued that a federal defendant seeking removal under § 1442 only needed to show that he had been summoned to court for an act done under color of office, regardless of whether the act gave rise to a federal defense. *See Mesa,* 489 U.S. at 125, 134, 109 S.Ct. 959. In other words, the government argued that federal defendants need not assert a federal defense to remove under § 1442. The Supreme Court rejected this argument, observing that the government's view would "present grave constitutional problems." *Id.* at 137, 109 S.Ct. 959. That is because a federal defendant could remove a case to federal court even if the case presented no controversy "arising under" federal law, as required by Article III, Section 2 of the Constitution. *Id.* at 136–37, 109 S.Ct. 959. The Court observed:

> Section 1442(a), in our view, is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant. Section 1442(a), therefore, cannot independently support Art. III "arising under" jurisdiction. Rather, it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if a federal defense were alleged.

*Id.* at 136, 109 S.Ct. 959. Plaintiff interprets this passage to mean that, unless the removal notice itself articulates a defense arising under federal law, a federal court cannot exercise jurisdiction under § 1442. MTR Reply at 4. Plaintiff's view, though, confuses the constitutional and statutory requirements for removal jurisdiction.

■ It is axiomatic that the judicial power of the United States provided by Article III is broader than the jurisdiction actually exercised by the federal courts, and that Congress may tailor that jurisdiction by statute. *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 495, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *see also Mireles v. Wells Fargo Bank, N.A.,* 845 F.Supp.2d 1034, 1047 (C.D.Cal.2012) (citing *Libhart v. Santa Monica Dairy Co.,* 592 F.2d 1062, 1064 (9th Cir.1979)) ("The right to remove a case to federal court is entirely a creature of statute."); *Hunter v. United Van Lines,* 746 F.2d 635, 639 (9th Cir. 1984) ("Congress plainly has the power to confer removal jurisdiction over cases in which only the defense is based on federal law."). Plaintiff reads *Mesa* as a case about the formal or procedural—that is, the statutory—requirements of § 1442 removal. But *Mesa* is a case about the *constitutional* requirements of § 1442 removal. It holds only that the Constitution requires cases removed under § 1442 to present the federal court with a controversy arising under federal law, but that, in a departure from the usual, "well-pleaded complaint" rule, a defense may supply the constitutionally requisite federal question. This holding simply does not address the question of where and how—i.e., in which paper—the defense must appear.

That *Mesa* does not address this question is no surprise, for although the *Mesa* Court focused on § 1442, it is § 1446 that governs the form of the removal notice. *See Ely Valley Mines, Inc. v. Hartford*

*Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir.1981) (applying procedural requirements of § 1446 where right to remove was provided by § 1442). *Durham* suggests that the same presumption in favor of removal that applies to § 1442 applies with equal force to § 1446. *See* 445 F.3d at 1253 (extending pro-removal presumption to § 1446 "where the timeliness of a federal officer's removal is at issue"). Whether it does or not, § 1446 requires a party seeking removal to include nothing more than a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a).

█ Unfortunately, while FFB's notice of removal does include a "short and plain statement," what it states is not actually the "grounds for removal." The removal notice merely recites, in relevant part: "This action must be removed to federal district court pursuant to 28 U.S.C. [§ ] 1442(a)(1) because it is a civil action against an agency and instrumentality of the United States Government." NOR ¶ 5. This statement is inadequate because it does not supply facts that would permit Plaintiff or the Court to determine that *Durham's* three-pronged test for federal-agency removal had been met, the relevant facts being the agency's "personhood" under the statute, the required causal nexus, and the agency's federal defenses. 445 F.3d at 1251.

Nevertheless, the defect in the removal notice is merely a defect of form that does not strip this Court of jurisdiction. Given that FFB clearly can assert some colorable federal defense, the Court is not inclined to frustrate the Congressional purpose of the federal-agency removal statute with a "grudging, narrow" ruling that would remand this action to state court and thereby deprive FFB of the opportunity to test its federal defenses in a federal forum. The appropriate course of action is for the Court to retain jurisdiction but require FFB to comply with § 1446 by amending its notice of removal to state the *actual* grounds for removal jurisdiction.[11] Frankly, the Court is perplexed as to why the U.S. Attorney did not state them in the first place. The government cannot expect simply to wave toward § 1442 and then waltz into federal court without making any showing that would allow a plaintiff (or a district judge) to determine that removal was proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir.1992) (rejecting removal notice where defendant baldly concluded that jurisdictional requirements were satisfied, "as if attempting to recite some 'magical incantation' "); *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir.1998) (directing district courts to test propriety of removal on basis of the record extant "at the time of removal").[12] Perhaps

---

**11.** *Cf. Russell v. U.S. Department of Housing & Urban Development*, 214 F.Supp.2d 933 (W.D.Ark.2002). In that case, a federal defendant removed to federal court, stating in its notice of removal only that the case was "an action for specific performance against an agency of the United States of America, and [was] thus removable by the United States under [§ 1442]." *Id.* at 934. The plaintiffs moved for remand on the ground that "their complaint does not allege a federal claim and the removal notice does not allege adequate grounds for removal under section 1442(a)(1) because it fails to allege a colorable federal defense." *Id.* The·district court

inquired whether it was "apparent from the removal notice that [the federal agency] ha[d] a federal defense to the complaint." *Id.* The court found that the removal notice was "deficient in this respect," but retained jurisdiction regardless, since the federal agency had "filed an amended notice of removal" that set forth the specific defense it was raising. *Id.*

**12.** The removal statutes themselves clearly evince Congressional concern about this sort of rote removal. *See* 28 U.S.C. §§ 1446(a) (reminding attorneys that removal notices are subject to Rule 11), 1447(c) (authorizing courts ordering remand to require defendants

aware of this, FFB appears to seek leave to amend its notice of removal in the event that the Court finds it technically deficient. *See* MTR Opp'n at 6.

■ Plaintiff argues that FFB should not be allowed to amend its removal notice because the thirty-day period for removal provided by § 1446(b) has long since elapsed. MTR Reply at 6–8. Plaintiff is wrong. First, the cases cited by Plaintiff stand only for the uncontroversial proposition that, once the thirty-day period elapses, a defendant is not permitted to amend the notice of removal to add a "separate basis" for removal jurisdiction— that is, to state an entirely new reason. *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Montana,* 213 F.3d 1108, 1117 (9th Cir.2000); *see also Sonoma Falls Developers, LLC v. Nevada Gold & Casinos, Inc.,* 272 F.Supp.2d 919, 926 (N.D.Cal.2003). That is not what FFB seeks leave to do here. The notice of removal set forth the legal basis for removal, § 1442, as well as facts which purport to justify removal on that ground, namely, the fact that FFB is "an agency and instrumentality of the United States Government." NOR ¶ 5. As explained above, that fact alone is not enough to support removal, and FFB's notice of removal should have supplied facts addressing the jurisdictional requirements enunciated in *Durham.* Nevertheless, amendment at this point would not add a separate basis for jurisdiction; it would merely clarify the factual underpinnings of the previously asserted basis. As the cases cited by Plaintiff recognize, that is permissible. *E.g., ARCO,* 213 F.3d at 1117.

Nothing in *Bays* is inconsistent with this conclusion, contrary to Plaintiff's interpretation of that case. MTR Reply at 7–8

(citing *Bays v. Spectrum Sec. Servs.,* Case No. CV 10–04362 DDP (MANx), 2010 WL 4008330, 2010 U.S. Dist. LEXIS 112057 (C.D.Cal. Oct. 7, 2010)). In *Bays,* the district court specifically found that the defendant "ha[d] not demonstrated that it ha[d] a colorable federal defense...." 2010 WL 4008330, at *2, 2010 U.S. Dist. LEXIS 112057, at *4. As such, the defendant could not satisfy the jurisdictional requirements of Article III. *See Mesa,* 489 U.S. at 136–37, 109 S.Ct. 959. In this case, however, FFB has established that it has such defenses, so *Bays* is inapposite.

In summary, the Court concludes that it has removal jurisdiction over this case because FFB can assert colorable federal defenses and the Court is otherwise satisfied that FFB meets the criteria for removal under § 1442. *Supra* note 10. The deficiencies in the notice of removal are merely technical and hence amendable at any time. The Court therefore DENIES Plaintiff's motion to remand. Consequently, Plaintiff's request for an award of removal-related attorney fees, MTR at 15, is DENIED.

Though the Court retains jurisdiction over this matter, FFB still must comply with the formal requirements of § 1446. Therefore, the Court ORDERS FFB to file, within seven (7) days of the signature date of this Order, an amended notice of removal that sets forth the grounds of removal consistent with § 1446, *Durham,* and the guidance herein.

### B. *Motion to Dismiss*

FFB moves to dismiss Plaintiff's complaint under Rule 12(b)(1) or, in the alternative, to enter summary judgment in its favor. FFB marshals three arguments toward these ends. First, FFB contends

to pay the "just costs and any actual expenses, including attorney fees, incurred as a result of the removal").

that, because it is an instrumentality of the U.S. government, sovereign immunity shields it from Plaintiff's state—law claim for enforcement of the bonded stop notice. Second, FFB argues that, as applied in the circumstances of this case, California's stop-notice law conflicts with and therefore is preempted by the FFB Act and the Energy Policy Act. Finally, in the event that the Court does not dismiss the case under Rule 12(b)(1), FFB asks the Court to treat its motion as one for summary judgment and find that FFB is not a "construction lender," as California's stop-notice law defines that term. The Court addresses each argument in turn.

### 1. Sovereign Immunity

#### a. Legal Standard

■■■ "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). "Sovereign immunity is jurisdictional in nature. Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (internal quotation marks and brackets omitted); *see also Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir.2011) ("The waiver of sovereign immunity is a prerequisite to federal-court jurisdiction."). Though defendant FFB is the party who has moved to dismiss this case, Plaintiff is the one who bears the burden of establishing that FFB lacks sovereign immunity and hence that federal jurisdiction is proper, notwithstanding Plaintiff's attempts to remand the case. *See Levin v. United States*, 663 F.3d 1059, 1063 (9th Cir.2011) (plaintiff bears burden of establishing waiver of sovereign immunity); *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 342

n. 3, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (burden of establishing federal jurisdiction is borne by the party asserting it at the time it is challenged, regardless of previous positions vis-à-vis removal).

■■■ The Supreme Court has set forth a two-step inquiry for determining whether sovereign immunity shields a government agency from a particular claim. *Meyer*, 510 U.S. at 484, 114 S.Ct. 996; *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 743, 124 S.Ct. 1321, 158 L.Ed.2d 19 (2004). In the first step, the Court must ask whether Congress has waived the government agency's sovereign immunity. *Meyer*, 510 U.S. at 484, 114 S.Ct. 996; *Flamingo Indus.*, 540 U.S. at 743, 124 S.Ct. 1321. If it has, the Court asks the second question, which is "whether the source of substantive law upon which the claimant relies provides an avenue for relief." *Meyer*, 510 U.S. at 484, 114 S.Ct. 996; *see also Flamingo Indus.*, 540 U.S. at 743, 124 S.Ct. 1321 (using *Meyer* test).

■■■ *Meyer* and *Flamingo Industries* stand for the idea that a waiver of sovereign immunity is a necessary but not sufficient condition for imposing liability on a federal defendant. The waiver makes liability possible, but only if the underlying claim is one that can reach the federal defendant. In *Meyer*, the predecessor to the FDIC, the Federal Savings and Loan Insurance Corporation ("FSLIC"), fired one of its employees. The former employee brought a *Bivens*[13] action on the theory that FSLIC had "deprived him of a property right (his right to continued employment under California law) without due process of law in violation of the Fifth Amendment." 510 U.S. at 474, 114 S.Ct. 996. The Supreme Court held that no

---

**13.** In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court inferred the existence of "a

cause of action for damages against federal agents who allegedly violated the Constitution." *Meyer*, 510 U.S. at 473, 114 S.Ct. 996.

Bivens action could lie against the FSLIC despite the agency's ability to "sue and be sued." *Id.* at 483–84, 114 S.Ct. 996. The Court reasoned that the source of substantive law underlying the plaintiff's claim— the Court's own earlier decision in *Bivens*—provided a cause of action against government *agents*, but not government *agencies* like FSLIC. *Id.* at 483–486, 114 S.Ct. 996.

Similarly, in *Flamingo Industries*, a company that had been supplying mail sacks to the United States Postal Service ("USPS") sued USPS for antitrust violations after USPS terminated its contract. 540 U.S. at 738, 124 S.Ct. 1321. Noting that Congress had authorized USPS to "sue and be sued," a unanimous Supreme Court concluded that the plaintiff nevertheless could not assert an antitrust claim against USPS because the source of substantive law in that case—the Sherman Act—only provided a cause of action against "persons," as defined by the statute. *Id.* at 744–45, 124 S.Ct. 1321. The Court held that USPS, as part of the executive branch of the federal government, was not a "person" within the meaning of the Sherman Act, and therefore the Sherman Act simply did not provide an avenue for relief against USPS, notwithstanding its lack of sovereign immunity. *Id.* at 745–47, 124 S.Ct. 1321.

Thus, the two-step *Meyer* test obligates courts to inquire not only whether Congress waived a federal defendant's sover-eign immunity, but also whether the plaintiff's claim can reach the federal defendant, notwithstanding its lack of immunity. The first question asks, in essence, whether the government has put down its shield; the second, whether plaintiff has been given a sword.[14]

### b. *Analysis*

As noted previously, the question of whether California's stop-notice laws reach FFB appears to be one of first impression. Proceeding to the first step in the *Meyer* analysis, the Court agrees with the parties that Congress waived FFB's sovereign immunity by giving FFB the power to "sue and be sued." 12 U.S.C. § 2289; MTD at 7, MTD Opp'n at 10–11. "[S]uch sue-and-be-sued waivers are to be liberally construed, notwithstanding the general rule that waivers of sovereign immunity are to be read narrowly in favor of the sovereign." *Meyer,* 510 U.S. at 480, 114 S.Ct. 996 (internal quotation marks and citations omitted). "It must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Flamingo Indus.,* 540 U.S. at 742, 124 S.Ct. 1321 (quoting *Fed. Hous. Admin., Region No. 4 v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724 (1940)) (brackets omitted); *see also Meyer,* 510 U.S. at 482–83, 114 S.Ct. 996 (a govern-

14. This second question is often framed as one of Congressional intent, even though in *Meyer* the lawmaking body in question was actually the *Bivens* Court. E.g., *id.* at 744, 124 S.Ct. 1321; *Currier v. Potter,* 379 F.3d 716, 724–26 (9th Cir.2004); *Anselma Crossing, L.P. v. U.S. Postal Serv.,* 637 F.3d 238, 242 n. 6 (3d Cir.2011); *MB Fin. Group, Inc. v. U.S. Postal Serv.,* 545 F.3d 814, 820 (9th Cir. 2008) (Tallman, J., dissenting). *Meyer* therefore suggests that the "avenue of relief" analysis does not turn on what the United States Congress intended; rather, it turns on whether the substantive body of law gives plaintiff a claim upon which relief can be granted, regardless of whether Congress is the source of the substantive body of law. This distinction, though admittedly fine, matters: Framing the matter as one of Congressional intent implies that only Congress can provide an "avenue of relief," which, in a case such as this one where a plaintiff appeals to *state* law for relief, unhelpfully suggests the existence of a federalism issue which is not actually present.

ment entity authorized to "sue and be sued" is subject to no less liability than a private corporation).

■ Hence, "agencies authorized to 'sue and be sued' are presumed to have fully waived immunity." *Meyer,* 510 U.S. at 481, 114 S.Ct. 996 (internal quotation marks omitted).[15] Because Congress authorized FFB to sue and be sued, the Court holds that Congress fully waived FFB's sovereign immunity and, accordingly, proceeds to the second step of the *Meyer* analysis.

In that step, the Court must determine whether the substantive law upon which Plaintiff relies, California's stop-notice law, provides Plaintiff with an "avenue for relief" against FFB. *Meyer,* 510 U.S. at 484, 114 S.Ct. 996. Accordingly, the Court "look[s] to the statute." *Flamingo Indus.,* 540 U.S. at 744, 124 S.Ct. 1321. The Court concludes that California's stop-notice laws do provide Plaintiff with an avenue for relief from FFB. Unlike the *Bivens* action asserted in *Meyer* and the antitrust claim in *Flamingo Industries,* nothing in California's stop-notice law is inconsistent with enforcement against the federal government, or, more specifically, against an instrumentality of the federal government that has been stripped of its immunity and launched into the commercial world.

■ Before turning to the statutory text, the Court observes that California's stop-notice laws are part of "an integrated scheme obviously designed to provide maximum protection to laborers and materialmen." *Mech. Wholesale Corp. v. Fuji Bank, Ltd.,* 42 Cal.App.4th 1647, 1656, 50 Cal.Rptr.2d 466 (Cal.Ct.App.1996). This scheme is "remedial" in nature and intended to be "liberally construed." *Connolly Dev., Inc. v. Sup. Ct.,* 17 Cal.3d 803, 826–27, 132 Cal.Rptr. 477, 553 P.2d 637 (1976). Laborers and materialmen may assert the stop-notice remedy against either (1) the owner of the work of an improvement or (2) the project's "construction lender." *Id.* at 809, 132 Cal.Rptr. 477, 553 P.2d 637. Plaintiff's theory is that FFB was a "construction lender" for purposes of the Solyndra project.

> "Construction lender" means [1] any mortgagee or beneficiary under a deed of trust lending funds with which the cost of the work of improvement is, wholly or in part, to be defrayed, or any assignee or successor in interest of either, or [2] any escrow holder or other party holding any funds furnished or to be furnished by the owner or lender or any other person as a fund from which to pay construction costs.

Cal. Civ.Code § 3087 (brackets added).[16]

Plaintiff argues that FFB falls within the second portion of the definition, which applies to any party who holds any "fund from which to pay construction costs." MTD Opp'n at 11–12. In essence, Plaintiff maintains that because FFB held funds for

---

**15.** The government overcomes this presumption only if it makes a clear showing that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority [to sue and be sued] is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the "sue and be sued" clause in a narrow sense.
*Meyer,* 510 U.S. at 480, 114 S.Ct. 996 (quoting *Fed. Hous. Admin., Region No. 4 v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724 (1940)). FFB has not attempted to make such a showing here.

**16.** As discussed in note 6, effective July 1, 2012, the California legislature restyled, reorganized, and renumbered the stop-notice laws. The statutory definition of the term "construction lender," formerly set forth at section 3087, is now set forth at section 8006, where it has been reorganized into subsections as suggested by the brackets added herein, but remains substantively the same.

Solyndra that were used for construction, FFB is a construction lender and hence subject to Plaintiff's stop notice. The Court agrees.

 FFB does not dispute that it was a lender, as that term is commonly understood. Indeed, it would be difficult to do so because FFB held a note from Solyndra in which Solyndra agreed to repay FFB the monies advanced. FFB's argument turns, rather, on the notion that it did not "hold" funds. According to FFB, California's "stop notice law was intended to apply to a lender who has loaned a sum certain, but who retains the proceeds as security or in loan fund accounts." MTD at 9. In contradistinction to such a lender, FFB characterizes itself as merely having "purchased a promissory note that was 100% guaranteed by the Secretary of Energy" and "advanced funds only after (1) a request was made by the borrower, and (2) the request was approved by the Secretary of Energy." *Id.* FFB emphasizes that it exercised no discretion over whether to approve advances requested by Solyndra; that discretion resided exclusively with the Secretary. FFB asserts that "[t]here are no undrawn funds sitting in an account at FFB in Solyndra's name," the implication being that there are no funds for Plaintiff to attach.

While FFB offers a number of formal distinctions between itself and a typical, private lender, FFB never establishes how these distinctions amount to a difference. What transpired here, stripped of its labels, is that a bank made a loan to a borrower to fund a construction project. Instead of the usual deed of trust, the bank accepted as security the guarantee of the federal government in the person of the Secretary of Energy. Though the Secretary oversaw whether, when, and to whom the monies would be disbursed, FFB actually disbursed the funds. FFB did so pursuant to a contractual arrange-

ment with Solyndra which committed a maximum amount of money to Solyndra which Solyndra could, and did, use to pay construction costs. In short, Solyndra's right to use money to pay construction costs constituted the "construction fund." The fact that Solyndra had the right to use funds provided by FFB is what made FFB the "construction lender."

 FFB argues that the stop-notice laws can reach only private banks or like entities who lend a "sum certain" which then resides in a dedicated account. MTD at 9, 10. First, that is not true. The statutory definition of "construction lender" applies by its plain language to a variety of parties, such as escrows and unidentified "other" parties. At least one California treatise notes that even fire or earthquake insurance carriers may be deemed "construction lenders" under the statute. *Cal. Constr. L. Manual* § 6:110 (6th ed.). The definition is simply more expansive than FFB would have it. Second, assuming that FFB's definition were correct and the stop-notice laws contemplated only the lenders of a sum certain who held funds in a dedicated account, it is not clear on the record before the Court that what transpired in this case is meaningfully different from that: A bank, albeit a federal one, made a loan to a borrower to fund a construction project. Third, FFB's position would make the efficacy of California's stop-notice laws depend on the picayune matter of which label is affixed to an account. That result is inconsistent with the California cases that counsel a liberal construction of the stop-notice laws to effect their remedial purpose, that remedial purpose being the vindication of rights to payment held by laborers and materialmen. It also is inconsistent with the statutory definition of a "construction lender," which describes construction funds in a functional way:

They are, simply, "funds furnished or to be furnished ... as a fund from which to pay construction costs." Cal. Civ.Code § 3087 (superseded July 1, 2012). The law says nothing about who must furnish the funds, to whom, or in what manner. The restyled version of the statutory definition makes its functional nature even more plain: It states that the term "construction lender" encompasses persons providing funds "with which the cost of all or part of a work of improvement is to be paid." *Id.* § 8006. This definition is functional, flexible, and, with respect to the Solyndra loan, applicable to FFB.

Considering FFB in light of its being subject to no less liability than a private corporation, *Meyer,* 510 U.S. at 482–83, 114 S.Ct. 996, the Court sees *A–1 Door* as analogous to this case. *A–1 Door & Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n,* 61 Cal.2d 728, 40 Cal.Rptr. 85, 394 P.2d 829 (Cal.1964). In that case, a defendant savings and loan association ("S & L") made a loan to the owners of unimproved real property so that the owners could build on the land. *Id.* at 731, 40 Cal.Rptr. 85, 394 P.2d 829. The owners executed promissory notes and then assigned the loan proceeds to the S & L, who agreed to disburse them in installments as the project went along. *Id.* Construction halted on the project and the S & L retained the loan proceeds. *Id.* Unpaid materialmen issued a stop notice and then sued the S & L for enforcement. *Id.* The California Supreme Court, in holding that the S & L could not use unexpended loan proceeds to reduce the amount of the owners' indebtedness or to complete construction, described the creation of a construction fund. It said that a construction fund was created when the S & L "lent specified amounts to the owners for construction purposes, and the owners executed promissory notes for, and agreed to pay interest on, the full amount of each loan." *Id.* at 734–35, 40 Cal.Rptr. 85, 394 P.2d

829. That is essentially what happened here, though FFB paid the money to Solyndra's creditors rather than directly to Solyndra itself. FFB's insistence to the contrary merely quibbles on the meaning of the phrase "construction fund." To agree with FFB in light of *A–1 Door,* the Court would have to find that FFB's loan was not one "for construction purposes." No party has asked the Court to find that fact. Accordingly, the Court rejects FFB's contention that it did not make a construction loan to Solyndra and, hence, that it did not serve as a construction lender within the meaning of California's stop-notice laws.

FFB's other arguments are also unavailing. FFB cites *Marcus Garvey Square* for the proposition that the existence of sovereign immunity is determined by the practical test of whether a judgment must be satisfied from the United States Treasury. MTD at 10; MTD Reply at 4–5 (citing *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co. of California, Inc.,* 595 F.2d 1126, 1132 (9th Cir. 1979)). The first problem with that position is that, if *Marcus Garvey Square* actually meant what FFB suggests it does, it would be in obvious conflict with the later-decided cases *Meyer* and *Flamingo Industries,* since it would supplant their two-step analysis with the single question of whether the judgment sought by the plaintiff would be satisfied from the U.S. Treasury. The second problem is that *Marcus Garvey Square* does not mean that. It speaks only to the question of whether the United States' sovereign immunity is waived by a statute authorizing an agency head to sue and be sued, when the United States rather than the agency head is the real party in interest. Those are not the facts of this case; FFB has been sued in its own name and Plaintiff does not seek to reach past FFB to the United States itself. The third problem is that, if sovereign

immunity barred any attempt to secure a judgment against a federal defendant that would be paid from the U.S. Treasury, it is unclear how Congress ever could waive it.

 FFB also suggests that the California state legislature lacks the authority to "give[ ] a contractor the right to recover from the United States Treasury." MTD at 10; MTD Reply at 4, 5. To the extent that FFB is suggesting that California cannot waive the federal government's sovereign immunity, FFB is correct. But the suggestion misses the point. As the Court discussed during the first step of the *Meyer* analysis, the California state legislature did not waive FFB's sovereign immunity. Congress did. And when Congress did so, it subjected FFB to liability in the manner of a private corporation. Private corporations are subject to stop notices under California law. Accordingly, so is FFB.

FFB suggests in passing that it cannot be subjected to a stop notice because it has and had no contractual relationship with Plaintiff. MTD Reply at 4. But the very nature of a stop notice is to supply laborers and materialmen with a remedy despite their lack of contractual relationship with the construction lender. *E.g., Connolly,* 17 Cal.3d at 809, 132 Cal.Rptr. 477, 553 P.2d 637 ("Failure of the owner or lender to withhold money as required by the [stop] notice may render him personally liable to the claimant, notwithstanding the absence of privity of contract."); *Mech. Wholesale Corp. v. Fuji Bank, Ltd.,* 42 Cal.App.4th 1647, 1659, 50 Cal.Rptr.2d 466 (Cal.Ct.App.1996) (The stop-notice remedy "is a liability which exists in the absence of any contractual privity whatsoever."). The lack of a contract between FFB and Plaintiff presents no bar to the relief Plaintiff seeks.

The root of FFB's objection to Plaintiff's stop notice appears to be that FFB is a government bank rather than a private bank and "simply does not work the way a private bank does." MTD Reply at 7; MTD at 9. But whether FFB "works" like a private bank in all of its particulars is not the question here. The question is whether FFB acted as a construction lender under California's stop-notice laws. The Court concludes that it did. When Congress launched FFB into the commercial world to serve as a lender for, among other things, construction projects, it waived FFB's sovereign immunity and hence subjected FFB to at least as much potential liability as a private corporation. *See Flamingo Indus.,* 540 U.S. at 742, 124 S.Ct. 1321; *Meyer,* 510 U.S. at 482–83, 114 S.Ct. 996. FFB cannot now escape liability solely by virtue of its status as a federal entity. Congress foreclosed that defense when it allowed FFB to sue and be sued. The only remaining question, then, is whether a California stop notice can reach an entity that loans money for a construction project, as FFB did. It can.

Because (1) Congress fully waived FFB's sovereign immunity and (2) California's stop-notice law provides Plaintiff with an avenue for relief from a construction lender such as FFB, FFB's Rule 12(b)(1) motion to dismiss this action on sovereign immunity grounds is DENIED.

### 2. Conflict Preemption

#### a. *Legal Standard*

FFB argues that Plaintiff's claim for enforcement of its stop notice must be dismissed because enforcement would conflict with, and therefore is preempted by, the FFB Act and the Energy Policy Act. Under the Supremacy Clause of the U.S. Constitution,[17] Congress has the power to

**17.** This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitu-

preempt state law. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Courts usually think of preemption as coming in three kinds: express, field, and conflict.[18] *See id.; Kroske v. U.S. Bank Corp.,* 432 F.3d 976, 981 (9th Cir.2005). FFB invokes only the third kind, conflict preemption.

 "[S]tate law is preempted by federal law to the extent that it actually conflicts with federal law." *Ctr. for Bio–Ethical Reform, Inc. v. City & Cnty. of Honolulu,* 455 F.3d 910, 917 (9th Cir.2006) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). A state law conflicts and is thus preempted "where [1] it is impossible for a private party to comply with both state and federal requirements, or where [2] state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Kroske,* 432 F.3d at 981 (quoting *English,* 496 U.S. at 79, 110 S.Ct. 2270) (brackets added). Additionally, courts must assume that "the historic police powers of the States" are not preempted "unless that [is] the clear and manifest purpose of Congress." *Id.* "The presumption of nonpreemption does not apply, however, when the State regulates in an area where there has been a history of significant federal presence." *Id.* (internal quotation marks omitted).

### b. *Analysis*

The Court begins by observing that California's stop-notice law lies squarely within an area traditionally regulated by the states pursuant to their historic police powers-construction law generally and specifically the remedial scheme protecting construction contractors' rights to payment on contracts. The stop-notice remedy at issue here is a creature entirely of California statute. *Mech. Wholesale Corp.,* 42 Cal.App.4th at 1657–58, 50 Cal. Rptr.2d 466. Neither party argues that there has been a "history of significant federal presence" in the area of California's mechanics' lien and stop-notice laws, nor is the Court aware of any such presence. Neither do the parties point to any clear or manifest signal that Congress passed the FFB Act or Energy Policy Act with the intent of preempting California's stop-notice law. The Court proceeds, therefore, from the assumption that Congress did not intend to preempt California's stop-notice laws. This presumption means FFB bears the burden of showing Congressional intent to preempt state law. *See Chamberlan v. Ford Motor Co.,* 314 F.Supp.2d 953, 962 (N.D.Cal.2004).

FFB does not argue that compliance with both federal law and California's stop-notice law would be impossible in this case. *See Kroske,* 432 F.3d at 981. Rather, it argues that the stop-notice remedy sought by Plaintiff would present "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.,* specifically, to Congress's purposes and objectives for the Energy Policy Act and the FFB Act. MTD at 11–13, MTD Reply at 7–9. The argument is unavailing.

 With respect to the Energy Policy Act, FFB simply fails to identify any statutory purpose or objective with which en-

---

tion or Laws of any State to the Contrary notwithstanding.
U.S. Const. art. VI, cl. 2.

**18.** These three categories are not "rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption:

A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

forcement of a stop notice would conflict. This is unsurprising: The Energy Policy Act provides a mechanism for providing federally-backed loans to the makers of innovative energy technologies, and it is difficult to envision how enforcement of a construction contractor's stop notice could impede this scheme. But regardless of whether such an impediment could be envisioned, FFB bears the burden of showing that California's stop-notice law presents an obstacle to Congress's objectives for the Energy Policy Act and, by failing to address those objectives with any specificity, it fails to carry its burden.

With respect to the FFB Act, FFB cites Congress's statement that its purpose in passing the FFB Act was "[1] to assure coordination of [federally assisted borrowing] programs with the overall economic and fiscal policies of the Government, [2] to reduce the cost of Federal and federally assisted borrowings from the public, and [3] to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281 (brackets added). FFB focuses its conflict-preemption argument on the second aspect of Congress's purpose, the reduction of costs borne by the public in financing federal borrowing programs like the one in which Solyndra par-

ticipated.[19] MTD at 12; MTD Reply at 9. FFB argues that requiring FFB to make good on Plaintiff's stop notice would undermine its ability to limit the cost of federally-backed borrowing programs. Id. This argument fails because it proves too much. FFB's position, if accepted, would mean that any state law whose enforcement resulted in increased costs for FFB would be conflict-preempted. That cannot possibly have been Congress's intent. A federal agency's diffuse, undifferentiated interest in reducing costs cannot be enough to preempt state law in the face of the presumption against preemption that applies in areas of traditional state regulation.[20] Neither can FFB's argument be squared with Congress's express authorization for FFB to purchase and be sued on obligations like the promissory note it purchased from Solyndra. Enforcement of Plaintiff's stop notice does not clearly or manifestly conflict with the purposes or objectives of the FFB Act.

Because FFB has not met its burden of showing that enforcing California's stop-notice law in this case would impermissibly hamper the purpose and objectives of either the FFB Act or the Energy Policy Act, FFB's Rule 12(b)(1) motion to dismiss

**19.** FFB makes glancing reference to Congress's stated object of coordination of federal borrowing programs, MTD Reply at 8, but never explains how enforcement of a stop notice would or even could impede the ability of the federal government to "coordinate" the interactions of federal agencies with the private lending market.

**20.** Additionally, materials provided by FFB suggest that Congress largely achieved its objective of saving taxpayer funds simply by creating FFB. See generally McNamar Report. Before FFB, a multiplicity of federal agencies had engaged in loan-guarantee programs, with the loans being sourced from private lending markets. The influx of federal agencies had the unintended effect of rais-

ing demand for private lending and hence increasing interest rates, at the expense of the taxpayer. Congress created FFB in part so that the federal government's left hand would know what its right hand was doing; hence, the emphasis in 12 U.S.C. § 2281 on "coordination" between federal agencies and minimizing "disruption" in private lending markets. The evidence supplied by FFB tends to show that Congress largely accomplished its cost-saving objective simply by creating FFB. See, e.g., id. at 14–15. It does not tend to show that Congress intended to shield FFB from any suit under state law which could raise costs for federal taxpayers. One wonders why, if Congress meant to do that, it did not simply preserve FFB's sovereign immunity.

this action on conflict preemption grounds is DENIED.

### 3. California's Definition of "Construction Lender"

FFB requests that if the Court denies its Rule 12(b)(1) motion, the Court treat the motion as one for summary judgment and enter judgment in its favor on the ground that FFB is not a construction lender under California law. However, as discussed above, FFB was such a construction lender with respect to the Solyndra project. Therefore, to the extent that FFB's motion is one for summary judgment, that motion is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff Kinetic Systems, Inc.'s motion to remand this action to California state court. Defendant Federal Financing Bank is hereby ORDERED to comply with 28 U.S.C. § 1446 by submitting an amended notice of removal within seven (7) days of the signature date of this Order and consistent with the guidance herein.

Additionally, the Court DENIES Defendant Federal Financing Bank's motion to dismiss this action on sovereign-immunity and conflict-preemption grounds. To the extent that Defendant's motion is construed as one seeking summary judgment on the ground that Defendant is not a "construction lender" under California law, that motion, too, is DENIED.

The parties may now commence court-sponsored mediation pursuant to the Court's August 15, 2012 approval of their stipulation to do so. ECF No. 36 ("ADR Order"). The ADR Order set a deadline for completing mediation: ninety (90) days after resolution of the pending motions to remand and dismiss. Those motions now being resolved, the mediation deadline is set. The parties shall complete court-sponsored mediation within ninety (90) days of the signature date of this Order.

Following mediation, both parties shall appear for a case management conference at 10:00 a.m. on Friday, January 11, 2013, in Courtroom One, United States Courthouse, 450 Golden Gate Avenue, San Francisco, California.

IT IS SO ORDERED.